**SCHEDULED FOR ARGUMENT ON MAY 8, 2014**

**Nos. 13-5368, 13-5371 & 14-5021**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

PRIESTS FOR LIFE,

Plaintiff-Appellant,

and

ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, et al.,

Plaintiffs-Appellants/Cross-Appellees,

v.

KATHLEEN SEBELIUS, in her official capacity as
Secretary of Health and Human Services, et al.,

Defendants-Appellees/Cross-Appellants.

————————————

On Appeals from the United States District Court for the District of Columbia
(No. 13-1261 (Sullivan, J.) and No. 13-1441 (Berman Jackson, J.))

————————————

**BRIEF FOR THE APPELLEES/CROSS-APPELLANTS**

————————————

STUART F. DELERY
  *Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

MARK B. STERN
ALISA B. KLEIN
ADAM C. JED
  *(202) 514-5089*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7531*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
PURSUANT TO CIR. R. 28(a)(1)**

### A.    Parties and *Amici*

The plaintiffs in *Priests for Life* are Priests for Life; Father Frank Pavone; Alveda King; and Janet Morana.  The plaintiffs in *Roman Catholic Archbishop of Washington* are the Roman Catholic Archbishop of Washington; Archbishop Carroll High School, Inc.; Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc.; Mary of Nazareth Roman Catholic Elementary School, Inc.; Catholic Charities of the Archdiocese of Washington, Inc.; Victory Housing, Inc.; the Catholic Information Center, Inc.; the Catholic University of America; and Thomas Aquinas College.

Defendants in both cases are the U.S. Department of Health and Human Services; Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services; the U.S. Department of Labor; Thomas E. Perez, in his official capacity as Secretary of Labor; the U.S. Department of the Treasury; and Jacob J. Lew, in his official capacity as Secretary of the Treasury.

Amicus briefs were filed on appeal by Association of Rescue Gospel Missions; Prison Fellowship Ministries; Association of Christian Schools International; American Bible Society; National Association of Evangelicals; Ethics and Religious Liberty Commission of the Southern Baptist Convention; Institutional Religious Freedom Alliance; Lutheran Church-Missouri Synod; and the Christian Legal Society. The American Civil Liberties Union filed an amicus brief in district court.

**B.    Rulings Under Review**

The rulings under review in *Priests for Life* are the December 19, 2013 opinion and order granting the government's motion to dismiss the complaint.  The decision was issued by the Honorable Emmett G. Sullivan in Case No. 13-1261 (D.D.C.).  *See* Docket Nos. 35, 36.

The rulings under review in *Archbishop of Washington* are the December 20, 2013, judgment and opinion granting in part and denying in part the government's motion to dismiss, or in the alternative, for summary judgment.  The decision was issued by the Honorable Amy Berman Jackson in Case No. 13-1441 (D.D.C.).  *See* Docket Nos. 47, 48.

**C.    Related Cases**

The *Roman Catholic Archbishop of Washington* case was previously before this Court.  *See* No. 13-5091 (D.C. Cir. Sept. 6, 2013).

The issues presented in these appeals are also presented in *Belmont Abbey* v. *Sebelius*, No. 13-cv-01831 (D.D.C.), which has been stayed pending this Court's decision in these appeals.

The same issues are also presented in the following cases pending before other courts of appeals:

*Roman Catholic Archdiocese of New York* v. *Sebelius*, No. 14-427 (2d Cir.)

*Geneva College* v. *HHS*, No. 14-1374 (3d Cir.)

*Persico* v. *Sebelius*, No. 14-1376 (3d Cir.), and *Zubik* v. *Sebelius*, No. 14-1377 (3d Cir.) (consol.)

*East Texas Baptist Univ.* v. *Sebelius*, No. 14-20112 (5th Cir.)

*University of Dallas* v. *Sebelius*, No. 14-10241 (5th Cir.)

*Catholic Diocese of Beaumont* v. *Sebelius*, No. 14-40212 (5th Cir.)

*Michigan Catholic Conference* v. *Sebelius*, No. 13-2723 (6th Cir.), and *Catholic Diocese of Nashville* v. *Sebelius*, No. 13-6640 (6th Cir.) (consol.)

*Legatus* v. *Sebelius*, No. 14-1183 (6th Cir.)

*Ave Maria Foundation* v. *Sebelius*, No. 14-1310 (6th Cir.)

*Grace Schools* v. *Sebelius*, No. 14-1430, and *Diocese of Fort Wayne-South Bend* v. *Sebelius*, No. 14-1431 (7th Cir.) (consol.)

*Sharpe Holdings, Inc.* v. *HHS*, No. 14-1507 (8th Cir.)

*Little Sisters of the Poor* v. *Sebelius*, No. 13-1540 (10th Cir.)

*S. Nazarene Univ.* v. *Sebelius*, No. 14-6026 (10th Cir.)

*Reaching Souls Int'l* v. *Sebelius*, No. 14-6028 (10th Cir.)


                                    /s/  *Adam C. Jed*
                                    Adam C. Jed

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION .......................................................................................... 1

STATEMENT OF JURISDICTION .............................................................. 2

STATEMENT OF THE ISSUES .................................................................. 3

STATUTES AND REGULATIONS .............................................................. 3

STATEMENT OF THE CASE ...................................................................... 3

A.     Regulatory Background .................................................................. 3

B.     Factual Background and Prior Proceedings ................................ 9

        PFL, No. 13-3586 ......................................................................... 9

        RCAW, Nos. 13-5371 & 14-5021 .............................................. 11

SUMMARY OF ARGUMENT .................................................................... 16

STANDARD OF REVIEW .......................................................................... 20

ARGUMENT .............................................................................................. 20

I.     The Challenged Regulations Do Not Impermissibly Burden
       Plaintiffs' Exercise of Religion Under RFRA .............................. 20

       A.     The Challenged Accommodations, Which Allow Plaintiffs
              to Opt Out of Providing Contraceptive Coverage, Do Not
              Substantially Burden Plaintiffs' Religious Exercise Under
              RFRA 20 ................................................................................... 20

              1.     Plaintiffs are either automatically exempt from or
                     permitted to opt out of providing contraceptive
                     coverage ........................................................................ 20

2.      Plaintiffs object to requirements imposed on third parties, not on themselves. ........................................................... 22

3.      The specific "actions or forbearances" cited by plaintiffs as burdening their exercise of religion underscore that their objections are to the duties imposed on third parties ................. 28

4.      Plaintiffs' analysis disregards the burdens placed on plan participants and beneficiaries if plaintiffs' position were accepted ................................................................ 37

5.      It is the province of this Court to consider whether regulations that allow plaintiffs to decline to provide contraceptive coverage "substantially" burden their exercise of religion .......................................................... 39

B.      Plaintiffs' Claims Would Fail Even If the Accommodations Were Subject to RFRA's Compelling-Interest Test ................................. 43

II.     Plaintiffs Have Not Identified Any Violation of Their Constitutional Rights ........................................................... 46

A.      The Regulations Do Not Violate the Free Exercise Clause .................... 46

B.      The Regulations Do Not Violate Plaintiffs' Freedom of Speech or Expressive Association ........................................ 49

C.      The Regulations Do Not Violate the Establishment Clause or Equal Protection Clause or Interfere with Internal Church Governance ................................................... 52

D.      The Departments Have Not Misunderstood Their Own Regulations ............................................................... 55

CONCLUSION ................................................................ 57

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page**

*Auer* v. *Robbins,*
   519 U.S. 452 (1997) ..................................................................... 34, 57

*Blackhawk* v. *Pennsylvania,*
   381 F.3d 202 (3d Cir. 2004) ........................................................... 49

*Board of Education* v. *Allen,*
   392 U.S. 236 (1968) ........................................................................ 27

*Bowen* v. *Roy,*
   476 U.S. 693 (1986) .................................................................. 40, 45

*Boy Scouts of America* v. *Dale,*
   530 U.S. 640 (2000) ........................................................................ 51

*Braunfeld* v. *Brown,*
   366 U.S. 599 (1961) ........................................................................ 36

*Brown* v. *Socialist Workers '74 Campaign Comm.,*
   459 U.S. 87 (1982) .......................................................................... 51

*Catholic Diocese of Nashville* v. *Sebelius,*
   _ F. Supp. 2d _, 2013 WL 6834375 (M.D. Tenn. Dec. 26, 2013)
   *appeal pending,* No. 13-6640 (6th Cir.) ........................................ 47

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah,*
   508 U.S. 520 (1993) .................................................. 17, 46, 48, 49

*City of Boerne* v. *Flores,*
   521 U.S. 507 (1997) ........................................................................ 46

---

\* Authorities chiefly relied upon are marked with an asterisk.

*Cutter* v. *Wilkinson,*
  544 U.S. 709 (2005) ........................................................................ 38

*Employment Division* v. *Smith,*
  494 U.S. 872 (1990) .................................................................. 20, 46

*Estate of Thornton* v. *Caldor, Inc.,*
  472 U.S. 703 (1985) ........................................................................ 38

*Gilardi* v. *U.S. Dep't of Health & Human Servs.,*
  733 F.3d 1208 (D.C. Cir. 2013)
  *petitions for cert. pending,* Nos. 13-567, 13-915 (S. Ct.) ...................... 11, 25, 44

*Gillette* v. *United States,*
  401 U.S. 437 (1971) ........................................................................ 54

*Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ........................................................................ 20

*Healy* v. *James,*
  408 U.S. 169 (1972) ........................................................................ 51

*Henderson* v. *Kennedy,*
  253 F.3d 12 (D.C. Cir. 2001) ............................................................ 21

*Hobby Lobby Stores, Inc.* v. *Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) (*en banc*), *cert. granted,* 134 S. Ct. 678 (2013) .............. 24

*\*Kaemmerling* v. *Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) .................................................... 40, 41, 42

*Korte* v. *Sebelius,*
  735 F.3d 654 (7th Cir. 2013)
  *petition for cert. pending,* No. 13-937 .......................................... 24, 25, 26

*Larson* v. *Valente,*
  456 U.S. 228 (1982) .................................................................... 53, 54

* Authorities chiefly relied upon are marked with an asterisk.

iv

*Lyng* v. *Northwest Indian Cemetery Protective Ass'n,*
  485 U.S. 439 (1988) ........................................................... 40

*Mahoney* v. *Doe,*
  642 F.3d 1112 (D.C. Cir. 2011) ....................................... 40

*Michigan Catholic Conference* v. *Sebelius,*
  _ F. Supp. 2d _, 2013 WL 6838707 (W.D. Mich. Dec. 27, 2013)
  *appeal pending,* No. 13-2723 (6th Cir.) .......................21, 22, 48

*NLRB* v. *Gissel Packing Co.,*
  395 U.S. 575 (1969) ....................................................33, 34

*O'Brien* v. *U.S. Dep't of Health & Human Servs.,*
  894 F. Supp. 2d 1149 (E.D. Mo. 2012) ........................... 48

*Pullman Co.* v. *Knott,*
  235 U.S. 23 (1914) ........................................................... 32

*Rumsfeld* v. *Forum for Academic & Inst. Rights, Inc.,*
  547 U.S. 47 (2006) ........................................................... 50

*S. Nazarene Univ.* v. *Sebelius,*
  No. 13-cv-1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013)
  *appeal pending,* No. 14-6026 (10th Cir.)) ........................ 24

*Sherbert* v. *Verner,*
  374 U.S. 398 (1963) ........................................................ 37

*Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.,*
  450 U.S. 707 (1981) ................................................26, 42, 43

*Tilton* v. *Richardson,*
  403 U.S. 672 (1971) ........................................................ 26

* Authorities chiefly relied upon are marked with an asterisk.

*Tony & Susan Alamo Found.* v. *Sec'y of Labor*,
  471 U.S. 290 (1985) ................................................................................. 17, 36

*Town of Barnstable, Mass.* v. *FAA*,
  740 F.3d 681 (D.C. Cir. 2014) .................................................................. 34

*Trans World Airlines, Inc.* v. *Hardison*,
  432 U.S. 63 (1977) .................................................................................... 38

*United States* v. *Lee*,
  455 U.S. 252 (1982) ............................................................................ 38, 48

*United States* v. *Williams*,
  553 U.S. 285 (2008) .................................................................................. 34

*University of Great Falls* v. *NLRB*,
  278 F.3d 1335 (D.C. Cir. 2002) ............................................................... 54

*University of Notre Dame* v. *Sebelius*,
  _ F. Supp. 2d. _, 2013 WL 6804773 (N.D. Ind. Dec. 20, 2013)
  *aff'd*, _ F.3d. _, 2014 WL 687134 (7th Cir. Feb. 21, 2014) ........................... 2, 22, 25, 26

*University of Notre Dame* v. *Sebelius*,
  _ F.3d. _, 2014 WL 687134 (7th Cir. Feb. 21, 2014) ................................. 2, 19, 25, 53

*Walz* v. *Tax Comm'n of the City of New York*,
  397 U.S. 664 (1970) ............................................................................ 19, 53

*Weaver* v. *U.S. Information Agency*,
  87 F.3d 1429 (D.C. Cir. 1996) ............................................................. 18, 34

*Wheaton College* v. *Sebelius*,
  703 F.3d 551 (D.C. Cir. 2012) ................................................................... 5

*Wisconsin* v. *Yoder*,
  406 U.S. 205 (1972) ............................................................................ 37, 38

---

* Authorities chiefly relied upon are marked with an asterisk.

**Statutes:**

26 U.S.C. § 410(d) ................................................................. 27

26 U.S.C. § 6033(a)(3)(A)(i) ............................... 5, 19, 21, 53

26 U.S.C. § 6033(a)(3)(A)(iii) ........................... 5, 19, 21, 53

28 U.S.C. § 1291 ................................................................... 3

28 U.S.C. § 1331 ................................................................... 2

29 U.S.C. § 1002(33) ........................................................... 27

29 U.S.C. § 1003(b)(2) ......................................................... 27

42 U.S.C. § 2000bb et seq. ................................................... 9

42 U.S.C. § 2000bb(a)(4) ..................................................... 20

42 U.S.C. § 2000bb(a)(5) ..................................................... 20

42 U.S.C. § 2000bb(b)(1) ............................................... 20, 37

42 U.S.C. § 2000bb-1 ........................................................... 39

42 U.S.C. § 300gg-13 ............................................................. 4

42 U.S.C. § 300gg-13(a)(4) ................................................... 4

**Regulations:**

26 C.F.R. § 54.9815-2713(a)(1)(iv) ..................................... 5

26 C.F.R. § 54.9815-2713A(a) ............................................. 6

* Authorities chiefly relied upon are marked with an asterisk.

29 C.F.R. § 2510.3-16(b) ................................................................ 34

29 C.F.R. § 2590.715-2713(a)(1)(iv) ............................................. 5

29 C.F.R. § 2590.715-2713A(a) ............................................ 6, 21

29 C.F.R. § 2590.715-2713A(a)(4) ....................................... 6, 21

29 C.F.R. § 2590.715-2713A(b)(1) ....................................... 6, 21

29 C.F.R. § 2590.715-2713A(b)(1)(ii)(A) ........................8, 23, 35

29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B) ............................... 35

29 C.F.R. § 2590.715-2713A(b)(1)(iii) ............................. 15, 33

29 C.F.R. § 2590.715-2713A(b)(2) ............................................ 8

29 C.F.R. § 2590.715-2713A(b)(2)(i) .................................. 22, 28

29 C.F.R. § 2590.715-2713A(b)(2)(ii) ................................. 22, 28

29 C.F.R. § 2590.715-2713A(b)(3) ..................................... 1, 8

29 C.F.R. § 2590.715-2713A(c)(1) ...................................... 6, 21

29 C.F.R. § 2590.715-2713A(d) ..................... 9, 23, 24, 29, 50

45 C.F.R. § 147.130(a) ................................................... 55

45 C.F.R. § 147.130(a)(1)(iv) ......................................... 5, 6

45 C.F.R. § 147.131(a) ..............................5, 19, 21, 53, 55, 56

45 C.F.R. § 147.131(b) ................................................. 6, 21

45 C.F.R. § 147.131(c)(1) ................................................ 21

* Authorities chiefly relied upon are marked with an asterisk.

45 C.F.R. § 147.131(c)(2) ............................................................. 7, 28

45 C.F.R. § 147.131(c)(2)(i)(A) .................................................. 7, 22

45 C.F.R. § 147.131(c)(2)(i)(B) ...................................................... 1

45 C.F.R. § 147.131(c)(2)(ii) .............................................1, 7, 8, 22

45 C.F.R. § 147.131(d) ...................................................... 9, 23, 29, 50

45 C.F.R. § 147.131(f) ...................................................................... 7

45 C.F.R. § 156.50(d) ....................................................................... 8

77 Fed. Reg. 8725 (Feb. 15, 2012) ....................................4, 5, 50, 56

77 Fed. Reg. 16, 501 (March 21, 2012) ...................................... 56

78 Fed. Reg. 8456 (Feb. 6, 2013) ............................................... 56

78 Fed. Reg. 39,870 (July 2, 2013)............................... 1, 6, 10, 11, 18, 21, 25, 32
                                                                    33 ,35, 36, 47, 50, 55, 56

**Legislative Materials:**

139 Cong. Rec. E1234-01 (daily ed. May 11, 1993) ...................... 38

139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993)............20, 21, 38

155 Cong. Rec. S11985, S11986 (daily ed. Nov. 30, 2009)............... 47

155 Cong. Rec. S12265, S12271 (daily ed. Dec. 3, 2009) ............... 47

155 Cong. Rec. S12021-02, S12027 (daily ed. Dec. 1, 2009)........... 47

* Authorities chiefly relied upon are marked with an asterisk.

H.R. Rep. No. 88, 103d Cong., 1st Sess. (1993) ................................................. 21

S. Rep. No. 111, 103d Cong., 1st Sess. (1993) .......................................... 21, 26

**Other Authorities:**

Benefits Allocation Systems Website, www.basusa.com/about .................................... 32

Congressional Budget Office, *Key Issues in Analyzing*
   *Major Health Insurance Proposals* 6 (2008) .......................................... 7

Institute of Medicine, *Clinical Preventive Services for*
   *Women: Closing the Gaps* (2011) ........................................ 4

---

* Authorities chiefly relied upon are marked with an asterisk.

**GLOSSARY**

ERISA          Employee Retirement Income Security Act

HHS            U.S. Department of Health and Human Services

HRSA           Health Resources and Services Administration, a component of HHS

PFL            Priests for Life

RCAW           Roman Catholic Archbishop of Washington

RLUIPA         Religious Land Use and Institutionalized Persons Act

RFRA           Religious Freedom Restoration Act

TPA            Third party administrator

# INTRODUCTION

Plaintiffs challenge regulations that establish minimum health coverage requirements under the Affordable Care Act insofar as they include contraceptive coverage as part of women's preventive-health coverage.  Plaintiffs acknowledge, however, that they are either automatically exempt from this requirement, or that they may opt out of the coverage requirement by informing their insurance issuer or third party administrator that they are eligible for a religious accommodation set out in the regulations and therefore are not required "to contract, arrange, pay, or refer for contraceptive coverage." 78 Fed. Reg. 39,870, 39,874 (July 2, 2013).

Plaintiffs do not object to informing insurance issuers or third party administrators of their decision not to provide contraceptive coverage.  They object, instead, to requirements imposed not on themselves, but on insurance issuers and third party administrators.  In the case of an insured plan, when an eligible organization elects not to provide contraceptive coverage for religious reasons, the insurance company that issues policy for that organization's employees is required to provide separate payments for contraceptive services for the employees.  *See* 45 C.F.R. § 147.131(c)(2)(i)(B) and (ii).  In the case of a self-insured plan, these requirements generally must be met by the third party administrator that operates the plan.  *See* 29 C.F.R. § 2590.715-2713A(b)(3).  In all cases, the organization eligible for a religious accommodation does not administer this coverage and does not bear any direct or

indirect costs of the coverage, which is provided separately from its own health coverage.

Although plaintiffs are free to opt out of providing contraceptive coverage, they nevertheless claim that the challenged regulations impermissibly burden their exercise of religion in violation of the Religious Freedom Restoration Act ("RFRA"). But plaintiffs cannot transform their right, as eligible organizations, *not* to provide coverage into a substantial burden by characterizing their decision to opt out as "a permission slip" for third parties to provide contraceptive coverage.  Pl. Br. 10. Eligible organizations do not provide insurance issuers or third party administrators with "permission" to provide coverage, just as they do not provide the federal government with "permission" to reimburse third party administrators for the cost of providing such coverage.  These third parties provide coverage as a result of legal obligations imposed on them.  Plaintiffs are "free to opt out of providing the coverage [themselves], but [they] can't stop anyone else from providing it."  *University of Notre Dame* v. *Sebelius*, _ F. Supp. 2d. _, 2013 WL 6804773, at *1 (N.D. Ind. Dec. 20, 2013), *aff'd*, _ F.3d. _, 2014 WL 687134 (7th Cir. Feb. 21, 2014).

## STATEMENT OF JURISDICTION

Plaintiffs in these consolidated appeals invoked the district courts' jurisdiction under 28 U.S.C. § 1331.  The district court in *Priests for Life* ("*PFL*") entered final judgment on December 19, 2013, and the plaintiffs filed a notice of appeal the same day.  The district court in *Roman Catholic Archbishop of Washington* ("*RCAW*") entered

2

final judgment on December 20, 2013.  The plaintiffs filed a notice of appeal on

December 21, 2013, and the government filed a notice of appeal on January 17, 2014.

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether regulations that allow plaintiffs to opt out of providing

contraceptive coverage violate plaintiffs' rights under the Religious Freedom

Restoration Act.

2.  Whether these regulations violate plaintiffs' rights under the First

Amendment or Fifth Amendment to the Constitution.

3.  Whether the Departments' interpretation of their own regulations is plainly

erroneous or inconsistent with the regulations.

## STATUTES AND REGULATIONS

Pertinent provisions are reproduced in plaintiffs' addendum.

## STATEMENT OF THE CASE

### A.    Regulatory Background

**1.**  Congress has long regulated employer-sponsored group health plans.  In

2010, the Patient Protection and Affordable Care Act established certain additional

minimum standards for group health plans as well as health insurance issuers that

offer coverage in the group and the individual health insurance markets.  The Act

requires non-grandfathered group health plans and health insurance issuers offering

non-grandfathered health insurance coverage to cover four categories of

recommended preventive-health services without cost sharing, that is, without

requiring plan participants and beneficiaries to make copayments or pay deductibles

or coinsurance.  42 U.S.C. § 300gg-13.  As relevant here, these services include

preventive care and screenings for women as provided for in comprehensive

guidelines supported by the Health Resources and Services Administration ("HRSA")

(a component of the Department of Health and Human Services ("HHS")).  *Id.*

§ 300gg-13(a)(4).

HHS requested the assistance of the Institute of Medicine in developing these

guidelines.  77 Fed. Reg. 8725, 8726 (Feb. 15, 2012).  Experts, "including specialists in

disease prevention, women's health issues, adolescent health issues, and evidence-

based guidelines," developed a list of services "shown to improve well-being, and/or

decrease the likelihood or delay the onset of a targeted disease or condition."

Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 2-3 (2011).

These included the "full range" of "contraceptive methods" approved by the Food

and Drug Administration, *id.* at 10; *see id.* at 102-110, which the Institute found can

greatly decrease the risk of unwanted pregnancies, adverse pregnancy outcomes, and

other adverse health consequences, and vastly reduce medical expenses for women.

*See id.* at 102-07.

Consistent with those recommendations, the HRSA guidelines include "'[a]ll

Food and Drug Administration approved contraceptive methods, sterilization

procedures, and patient education and counseling for all women with reproductive

4

capacity,' as prescribed" by a health care provider. 77 Fed. Reg. at 8725 (quoting the guidelines). The relevant regulations adopted by the three Departments implementing this portion of the Act (HHS, Labor, and Treasury) require coverage of, among other preventive services, the contraceptive services recommended in the HRSA guidelines. 45 C.F.R. § 147.130(a)(1)(iv) (HHS); 29 C.F.R. § 2590.715-2713(a)(1)(iv) (Labor); 26 C.F.R. § 54.9815-2713(a)(1)(iv) (Treasury).

**2.** The implementing regulations authorize an exemption from the contraceptive-coverage provision for the group health plan of a "religious employer." 45 C.F.R. § 147.131(a). A religious employer is defined as a non-profit organization described in the Internal Revenue Code provision that refers to churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. *Ibid.* (cross-referencing 26 U.S.C. § 6033(a)(3)(A)(i) and (iii)).

When the initial final regulations were issued, the Departments announced, in response to religious objections raised by some commenters, that they would develop "'changes to these final regulations that would meet two goals'—providing contraceptive coverage without cost-sharing to covered individuals and accommodating the religious objections of [additional] non-profit organizations[.]" *Wheaton College* v. *Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam) (quoting 77 Fed. Reg. at 8727).

After notice and comment rulemaking, the Departments published the current regulations, challenged here, in July 2013. *See* 78 Fed. Reg. at 39,874-39,886; 45 C.F.R. § 147.131(b) (HHS); 29 C.F.R. § 2590.715-2713A(a) (Labor); 26 C.F.R. § 54.9815-2713A(a) (Treasury). The regulations provide religion-related accommodations for group health plans established or maintained by "eligible organizations" (and group health insurance coverage provided in connection with such plans). An "eligible organization" is an organization that satisfies the following criteria:

(1)    The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)    The organization is organized and operates as a nonprofit entity.

(3)    The organization holds itself out as a religious organization.

(4)    The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.

*E.g.*, 45 C.F.R. § 147.131(b); *see also* 78 Fed. Reg. at 39,874-75.

Under these regulations, an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections. 78 Fed. Reg. at 39,874. To be relieved of these obligations, it need only complete a form stating that it is an eligible organization and provide a copy to its insurance issuer or third party administrator. *See id.* at 39,874-75; *see, e.g.*, 29 C.F.R. § 2590.715-2713A(a)(4), (b)(1), (c)(1).

6

If an eligible organization chooses not to provide contraceptive coverage, the plan's participants and beneficiaries will generally have access to contraceptive coverage without cost sharing through alternative mechanisms established by the regulations.

When an eligible organization that chooses not to provide contraceptive coverage has an "insured" plan, the health insurance company that issues the policy for that organization is required by regulation to provide separate payments for contraceptive services for plan participants and beneficiaries. *See* 45 C.F.R. § 147.131(c)(2).[1] The insurance issuer may not impose any premium, fee, or other charge, directly or indirectly, on the eligible organization or the group health plan with respect to the issuer's payments for contraceptive services. *See id.* § 147.131(c)(2)(ii), (f). The insurance issuer must "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the . . . plan," *id.* § 147.131(c)(2)(i)(A), and "segregate premium revenue collected from the eligible

---

[1] An employer is said to have an "insured" plan if it contracts with an insurance company that bears the financial risk of paying health insurance claims. An employer is said to have a "self-insured" plan if it bears the financial risk of paying claims. Many self-insured employers use insurance companies or other third parties to administer their plans, performing functions such as developing networks of providers, negotiating payment rates, and processing claims. In that context, the insurance company or other third party is called a third party administrator or TPA. Employers may be regarded as self-insured even if they purchase a separate insurance policy (known as reinsurance or "stop loss" coverage), which is not a form of health insurance, to protect themselves against unusually high claims costs. *See generally* Congressional Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* 6 (2008).

organization from the monies used to provide payments for contraceptive services," *id.* § 147.131(c)(2)(ii).

When an eligible organization that chooses not to provide contraceptive coverage has a "self-insured" plan, the regulations generally require the third party administrator to provide or arrange separate payments for contraceptive services for plan participants and beneficiaries.  29 C.F.R. § 2590.715- 2713A(b)(2).  (As discussed below, these requirements do not apply when the third party administrator is administering a "church plan" as defined in ERISA.)  "The eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services."  *Id.* § 2590.715- 2713A(b)(1)(ii)(A).  The regulations bar the third party administrator from imposing any premium, fee, or other charge, directly or indirectly, on the eligible organization or the group health plan with respect to payments for contraceptive services.  *Id.* § 2590.715-2713A(b)(2).  The third party administrator may seek reimbursement for payments for contraceptive services from the federal government through an adjustment to Federally-facilitated Exchange user fees.  *Id.* § 2590.715-2713A(b)(3); *see* 45 C.F.R. § 156.50(d).

Regardless of the type of plan, an eligible organization that opts out of providing contraceptive coverage has no obligation to inform plan participants and beneficiaries of the availability of these separate payments made by third parties. Instead, the health insurance issuer or third party administrator itself provides this

8

notice, and does so "separate from" materials that are distributed in connection with the eligible organization's group health coverage. 45 C.F.R. § 147.131(d); 29 C.F.R. § 2590.715-2713A(d). That notice must make clear that the eligible organization is neither administering nor funding the contraceptive benefits. *Ibid.*

### B.    Factual Background and Prior Proceedings

These appeals arise out of two district court cases.

**1. a. *PFL*, No. 13-3586**. The plaintiffs in *PFL* are the non-profit organization Priests for Life ("PFL") and three of its managers. PFL offers health coverage to employees under an insured plan.

Plaintiffs contend that the religious accommodations set out above violate their rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, which provides that the government "shall not substantially burden a person's exercise of religion" unless the application of that burden is the least restrictive means to advance a compelling governmental interest. Plaintiffs argue that opting out of the coverage requirement substantially burdens their religious exercise because doing so "will then trigger the insurer's obligation to make 'separate payments for contraceptive services directly for plan participants and beneficiaries.'" Pl. Br. 12 (citation omitted). Plaintiffs also allege claims under the First Amendment and the Fifth Amendment.

The district court granted the government's motion to dismiss. The court rejected the RFRA claim because PFL, after certifying that it is eligible for the accommodation, "is not required to provide contraceptive services to its employees."

JA 154.  The court reasoned that "[t]he accommodation specifically ensures that
provision of contraceptive services is entirely the activity of a third party—namely,
the issuer—and Priests for Life plays no role in that activity."  JA 161-162; *see also*
JA 154 (noting that PFL need only certify that it meets the relevant criteria—"that it is
a religious, non-profit organization which opposes providing coverage for some or all
of any contraceptive services required to be covered" by the contraceptive-coverage
provision) (citing 78 Fed. Reg. at 39,874, 39,892).

The district court noted that plaintiffs "do not allege that the self-certification
itself violates their religious beliefs" and that plaintiffs conceded during oral argument
that "they have no religious objection to filling out the self-certification."  JA 140-141.
The court rejected, as without foundation, PFL's claims that it will be required to
"'identify its employees to its insurer for the distinct purpose of enabling and
facilitating the government's objective of promoting the use of contraceptive
services;' and 'coordinate with its insurer when adding or removing employees and
beneficiaries from its health care plan to ensure that these individuals receive coverage
for contraceptive services.'"  JA 154 n.3 (citations omitted).  The court explained that
plaintiffs "provide[d] no support for their claim that the challenged regulations require
either of these things."  *Ibid*.

The district court likewise rejected PFL's assertion that it "will ultimately have
to bear the costs" of insurance companies' payments for contraceptive services
"because the insurance companies will somehow find a way" to pass those costs on to

the eligible organizations.  *Ibid.*  The court found that this claim, too, was "without

support" and that the regulations "prohibit[] insurers from passing along any costs of

contraceptive coverage to eligible organizations . . . whether through cost-sharing,

premiums, fees, or other charges."  *Ibid.* (citing 78 Fed. Reg. at 39,875-39,877).

    The district court held that the insurance issuer's responsibilities under the

regulations do not establish a substantial burden on PFL's exercise of religion.  The

court reasoned that a "substantial burden exists when government action puts

'substantial pressure on an adherent to modify his behavior and violate his beliefs.'"

JA 157 (citations omitted).  By contrast, "an adherent is not substantially burdened by

laws requiring third parties to conduct their internal affairs in ways that violate his

beliefs."  *Ibid.* (citation omitted).  The court explained that, unlike the for-profit

corporations that brought suit in *Gilardi* v. *U.S. Dep't of Health & Human Servs.*, 733

F.3d 1208 (D.C. Cir. 2013), *petitions for cert. pending*, Nos. 13-567, 13-915 (S. Ct.), the

plaintiffs here "need not place contraceptive coverage into 'the basket of goods and

services that constitute [their] healthcare plan[s].'"  JA 166 (quoting *Gilardi*, 733 F.3d at

1217).  Therefore, plaintiffs fail to state a claim under RFRA.  The court also rejected

plaintiffs' various constitutional claims.  JA 167-182.

    **b.  RCAW, Nos. 13-5371 & 14-5021.**  The plaintiffs in the *RCAW* cross-

appeals are (1) the Roman Catholic Archbishop of Washington ("the Archdiocese"),

which is a religious employer that is exempt from the contraceptive-coverage

provision; (2) seven Catholic organizations that offer health coverage under the

Archdiocese's self-insured plan, which they allege is a "church plan" as defined by

ERISA; (3) Catholic University ("the University"), which offers health coverage to

students and employees under insured plans; and (4) Thomas Aquinas College ("the

College"), which offers health coverage to employees under a self-insured plan (which

is not alleged to be a "church plan"). Plaintiffs allege that the religious

accommodations described above violate their rights under RFRA, the First

Amendment, and the Equal Protection Clause. Plaintiffs also allege that the

Departments have misinterpreted their own regulations.[2]

On cross-motions for summary judgment, the district court ruled in part for

the government and in part for plaintiffs.

The district court rejected the RFRA claim asserted by Catholic University,

which offers health coverage to its employees and students through insured plans

issued by United Healthcare and Aetna, respectively. The court reasoned that, by

certifying that it meets the criteria for an accommodation, Catholic University can

relieve itself of the obligation to provide contraceptive coverage for its employees and

students (and their covered dependents). JA 476-486. The court rejected the

University's contention that the federal requirement that the insurance issuers provide

separate contraceptive coverage after the University opts out substantially burdens the

University's religious exercise. The court held that this objection to "'the provision

---

[2] Plaintiffs also alleged other claims under the Administrative Procedure Act but they have abandoned those claims on appeal.

of' the objectionable services by a third party to another third party" does not state a claim under RFRA.  JA 472 (citation and emphasis omitted).

The district court accepted the RFRA claim asserted by Thomas Aquinas College, which offers health coverage to its employees through a self-insured plan. JA 486-494.  The court acknowledged that the College's argument is "difficult to distinguish" from the argument made by Catholic University.  JA 491.  In particular, the court recognized that, by certifying that it meets the criteria for the accommodation, the College can relieve itself of the obligation to pay claims for contraceptive services.  *See* JA 492 (explaining that this "action eliminates any obligation to provide or pay for contraceptive services").  The court also acknowledged that the regulations "assign the obligation to someone else"—the third-party administrator—that is barred from charging the College for the cost of these separate payments and that may instead seek reimbursement from the federal government.  *Ibid.*  Additionally, the court noted that "any actions the third-party administrator takes with respect to contraceptive coverage must be completely independent from the eligible organization" and the "payments are totally separate from and cannot be imposed upon the religious organization, and the third-party administrator can even arrange for an entirely separate insurance issuer to provide the payments."  JA 491.  Accordingly, the court concluded that, "[i]f the third-party administrator accepts the obligation" to make or arrange separate payments for

13

contraceptives, the accommodation does not burden the College's exercise of religion. JA 493.

The district court declared, however, that the "operative word . . . is 'if,'" JA 493, and invalidated the accommodation on the basis of its understanding of what would happen in the hypothetical situation in which the third party administrator of the College's plan (Benefit Allocation Systems) terminates its contract with the plan sponsor. The court opined that, if the third party administrator were to decline to remain in a contractual relationship with the plan sponsor, the College would be required to "either shop around to find a new third-party administrator that will assume responsibility for the coverage or proceed without a third-party administrator and await instructions from the government on how it can otherwise satisfy its obligations." JA 488-489. The court stated that, in its view, "the obligation to take affirmative steps to identify and contract with a willing third-party administrator if the existing third-party administrator declines forces the religious organization to *do* something to accomplish an end that is inimical to its beliefs." JA 490 (court's emphasis). The court reasoned that "[t]his involves the organization in facilitating access to contraceptive services, which the College has averred it cannot do, and it entails the critical element of modifying one's behavior." *Ibid.* "Therefore," the court held, "the College has met its burden to identify a burden on religious exercise imposed by the regulations governing self-insured plans." *Ibid.*

14

The district court rejected the RFRA claims of the seven organizations that provide coverage through the Archdiocese's church plan. The court recognized that a church plan is not subject to regulation under ERISA, and the court noted the government's acknowledgment that it has no authority to require the third party administrator of a church plan to provide or arrange separate payments for contraceptive services. JA 494-495. The court held that the organizations that provide coverage through the Archdiocese's church plan lack standing because they offered no evidence to show that the third party administrator of their church plan will provide or arrange separate payments for contraceptives. JA 494-499; *see also* JA 534-536.

The district court rejected all but one of plaintiffs' constitutional claims. JA 499-534. The court interpreted one portion of one regulatory provision to impose a content-based restriction on an eligible organization's speech, and concluded that, thus interpreted, the measure violates the Speech Clause of the First Amendment. JA 520-521 (addressing 29 C.F.R. § 2590.715-2713A(b)(1)(iii)).

**2.** On plaintiffs' motions, a divided panel of this Court issued injunctions pending appeal in both of these cases. *See* 12/31/13 Order (Judges Henderson, Brown, Tatel (dissenting)). Plaintiffs (other than Thomas Aquinas College) subsequently filed petitions for a writ of certiorari before judgment, which are pending. *See Roman Catholic Archbishop of Washington* v. *Sebelius*, No. 13-829 (S. Ct.); *Priests for Life* v. *Sebelius*, No. 13-891 (S. Ct.).

15

## SUMMARY OF ARGUMENT

**I.**  Plaintiffs are either automatically exempt from the requirement to provide contraceptive coverage or can opt out of that requirement by completing a form and providing a copy to their health insurance issuer or third party administrator.  They object to opting out on the ground that, once they have done so, third parties will separately provide payments for contraceptive services without cost to or involvement by plaintiffs.

The requirements that federal law places on these third parties do not "substantially burden" plaintiffs' exercise of religion within the meaning of the Religious Freedom Restoration Act.  The only entities required to provide contraceptive coverage are insurance companies and third party administrators.  Plaintiffs cannot convert their opt-out right into a substantial burden by characterizing the opt-out as a "permission slip" (Pl. Br. 10) for the provision of contraceptive coverage by others.  Plaintiffs are not providing "permission" to third parties to perform duties established by federal law any more than they are providing "permission" to the United States to reimburse third parties for making separate payments for contraceptive services.

Both district courts correctly rejected the RFRA claims of the plaintiff organizations that have insured plans (Catholic University and PFL).  The *RCAW* court mistakenly accepted the RFRA claim of a plaintiff organization that has a self-insured plan (Thomas Aquinas College).  That ruling was premised on the court's

16

misunderstanding of the pertinent regulations, which do not require an eligible organization to take "affirmative steps to identify and contract with a willing third-party administrator if the existing third-party administrator declines" to make separate payments for contraceptives. JA 490. Plaintiffs' scenario is, in any event, entire hypothetical and could not provide a basis for invalidating the accommodation here: Benefits Allocation Systems, the third party administrator of the Thomas Aquinas College plan, has not raised any objection to making separate payments for contraceptives.

Moreover, if Thomas Aquinas or any other employer objects to particular aspects of the accommodation for self-insured plans, it is free to offer its employees an insured plan, as Catholic University and PFL do. This option obviates any objection that is based on the particulars of the accommodation for self-insured organizations. *See Tony & Susan Alamo Found.* v. *Sec'y of Labor*, 471 U.S. 290, 303-05 (1985).

**II.** Plaintiffs' other claims are similarly without merit.

**A.** The requirement that non-grandfathered plans cover recommended preventive-health services without cost sharing, including preventive services recommended for women, does not target religious practices in contravention of the Free Exercise Clause. The case bears no resemblance to *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah,* 508 U.S. 520 (1993), in which a state statute targeted the ritual animal sacrifices by members of a particular church.

17

**B.** Plaintiffs' contention that the accommodations infringe upon their constitutional rights to freedom of speech and association largely reprises their RFRA claim and fails for the same reasons. "The government has not compelled plaintiffs to speak, nor has it violated their rights to expressive association." JA 178. "Nothing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78 Fed. Reg. at 39,880 n.41.

Plaintiffs' contention that the accommodation for self-insured organizations includes a "gag rule" (Pl. Br. 57 n.15) rests on a misunderstanding of the cited provision. Over the government's objection, the *RCAW* court misinterpreted one phrase of one regulation to impose a content-based restriction on a self-insured organization's speech, and then proceeded to invalidate that phrase under the Speech Clause of the First Amendment. The regulation does not refer to speech, and it is not properly interpreted to restrict protected speech. *See Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1438 (D.C. Cir. 1996) ("We are, quite simply, reluctant to find burdens on speech that the government eschews any intention to impose.").

**C.** The regulations do not favor some churches or denominations over others in violation of the Establishment Clause or Equal Protection Clause, nor do they interfere with internal church governance. Under the regulations, an organization is a "religious employer" that is automatically exempt from the contraceptive-coverage provision if it "is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as

18

amended." 45 C.F.R. § 147.131(a). Other religiously affiliated non-profit organizations may opt out of providing contraceptive coverage by availing themselves of the accommodations.

The cited Internal Revenue Code provisions refer to churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. Although plaintiffs apparently believe that these tax code provisions are unconstitutional, "religious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities, 26 U.S.C. § 6033(a)(3)(A)(i) and (iii), without these advantages being thought to violate the establishment clause." *University of Notre Dame v. Sebelius*, _ F.3d _, 2014 WL 687134, *13 (7th Cir. Feb. 21, 2014) (citing *Walz* v. *Tax Comm'n of the City of New York*, 397 U.S. 664, 666 (1970) (upholding property tax exemptions for real property owned by religious organizations and used exclusively for religious worship)). That some religiously affiliated non-profit organizations, regardless of their denomination, are exempt from the contraceptive-coverage provision, while other religiously affiliated non-profit organizations, regardless of their denomination, may opt out by availing themselves of the accommodations, does not present any constitutional issue.

**D.** Plaintiffs are equally wide of the mark in declaring that the Departments have incorrectly interpreted the scope of the "religious employer" exemption in their own regulations. The preamble to the final regulations correctly explains that the religious employer exemption applies on an employer-by-employer basis.

19

## STANDARD OF REVIEW

The decisions below are subject to *de novo* review in this Court.

## ARGUMENT

I.   **The Challenged Regulations Do Not Impermissibly Burden Plaintiffs' Exercise of Religion Under RFRA.**

    A.   **The Challenged Accommodations, Which Allow Plaintiffs to Opt Out of Providing Contraceptive Coverage, Do Not Substantially Burden Plaintiffs' Religious Exercise Under RFRA.**

        1.   **Plaintiffs are either automatically exempt from or permitted to opt out of providing contraceptive coverage.**

Congress enacted RFRA to restore the compelling interest test for free-exercise cases that prevailed prior to *Employment Division* v. *Smith*, 494 U.S. 872 (1990). *See* 42 U.S.C. §§ 2000bb(a)(4), (5) and (b)(1). In *Smith*, the Supreme Court held that the Free Exercise Clause does not require religion-based exemptions from neutral laws of general applicability. *See* 494 U.S. at 876-90. RFRA later "adopt[ed] a statutory rule comparable to the constitutional rule rejected in *Smith*." *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).

The initial version of RFRA prohibited the government from imposing any "burden" on free exercise. Congress added the word "substantially" "to make it clear that the compelling interest standards set forth in the act" apply "only to Government actions [that] place a substantial burden on the exercise of" religion, as contemplated by pre-*Smith* case law. 139 Cong. Rec. S14350-01, S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy); *see ibid.* (statement of Sen. Hatch). *See also Henderson* v.

20

*Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) ("[O]nly *substantial* burdens on the exercise of religion trigger the compelling interest requirement.") (emphasis added). Consistent with RFRA's restorative purpose, Congress expected courts considering RFRA claims to "look to free exercise cases decided prior to *Smith* for guidance." S. Rep. No. 111, 103d Cong., 1st Sess. 8-9 (1993) (Senate Report); *see* H.R. Rep. No. 88, 103d Cong., 1st Sess. 6-7 (1993) (same).

None of the plaintiffs here is required to provide contraceptive coverage. The Archdiocese is automatically exempt from the contraceptive-coverage provision because it falls into the long established category in the Internal Revenue Code for churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order. *See* 45 C.F.R. § 147.131(a) (cross-referencing 26 U.S.C. § 6033(a)(3)(A)(i) and (iii)).

The remaining plaintiffs concede that they satisfy the criteria for the additional religious accommodations under which they do not have to provide contraceptive coverage. *See* 45 C.F.R. § 147.131(b) and (c)(1); 29 C.F.R. § 2590.715-2713A(a), (b)(1). To opt out of this coverage requirement, these plaintiffs need only complete a form stating that they are eligible and provide a copy to their insurance issuer or third party administrator. *See* 78 Fed. Reg. 39,870-01, 39,874-75 (July 2, 2013); *see, e.g.*, 29 C.F.R. § 2590.715-2713A(a)(4), (b)(1), (c)(1).

These plaintiffs need only "attest to [their] religious beliefs and step aside." *Michigan Catholic Conference v. Sebelius*, _ F. Supp. 2d _, 2013 WL 6838707, *7 (W.D.

21

Mich. Dec. 27, 2013), *appeal pending*, No. 13-2723 (6th Cir.). Indeed, they would need to inform their insurance insurers or third party administrators of their objection even if they were automatically exempt from the coverage requirement, to ensure that they would not be contracting, arranging, paying, or referring for such coverage. *Notre Dame*, _ F. Supp. 2d _, 2013 WL 6804773, *8. And "filling out the form is all that the ACA requires of the plaintiffs in this case." JA 141.

### 2.    Plaintiffs object to requirements imposed on third parties, not on themselves.

The responsibilities that the regulations place on insurance issuers and third party administrators require no action by any plaintiff. Plaintiffs will not "contract, arrange, pay, or refer" for such coverage, 78 Fed. Reg. at 39,874, and the regulations bar insurance issuers and third party administrators from passing along any costs, directly or indirectly, with respect to payments for contraceptive services. *See* 45 C.F.R. § 147.131(c)(2)(ii) (insured plans) ("With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries."); 29 C.F.R. § 2590.715-2713A(b)(2)(i) and (ii) (same for self-insured plans); *see also* 45 C.F.R. § 147.131(c)(2)(i)(A) (separate coverage must be "[e]xpressly exclude[d] . . . from the group health insurance coverage provided in connection with [plaintiffs'] group health

plan[s]"); 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(A) ("Obligations of the third party administrator" are imposed by regulation, and the employer does "not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services.").

Insurance issuers and third party administrators—rather than the eligible organizations—must notify plan participants and beneficiaries of the availability of separate payments for contraceptive services, and "[t]he notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services[.]" 45 C.F.R. § 147.131(d) (insured plans); 29 C.F.R. § 2590.715-2713A(d) (same for self-insured plans).

Plaintiffs do not contend that their religious exercise is burdened by completing a form that states that they are religious non-profit organizations with religious objections to providing contraceptive coverage. Their objection is instead that federal law requires insurers and third party administrators to provide coverage after plaintiffs declare that they will not provide coverage themselves. *See* JA 164 ("[I]t is only the subsequent actions of third parties—the government's and the issuer's provision of contraceptive services, in which Priests for Life plays no role—that animate its religious objections."); JA 472 (plaintiffs object to "'the provision of' the

23

objectionable services by a third party to another third party") (citation and emphasis omitted).

The theme of plaintiffs' argument is encapsulated by their assertion that the act of opting out of providing coverage "'in effect'" gives a third party "'a permission slip . . . to enable the plan beneficiary to get access, free of charge, from the institution's insurer or TPA, to the products to which the institution objects.'"  Pl. Br. 10-11 (quoting *S. Nazarene Univ.* v. *Sebelius*, No. 13-cv-1015, 2013 WL 6804265, at *8-9 (W.D. Okla. Dec. 23, 2013), *appeal pending*, No. 14-6026 (10th Cir.)).

Plaintiffs' attempt to collapse the provision of contraceptive coverage by third parties with their own decision *not* to provide such coverage fails.  Plaintiffs are not providing "permission" to third parties to perform duties established by federal law any more than they are providing "permission" to the United States to reimburse the third party administrator for its payments on behalf of individuals availing themselves of contraceptive coverage.  Employees and covered dependents will receive coverage for contraceptive services despite plaintiffs' religious objections, not because of them.

Plaintiffs are thus wrong to declare that they face "the exact choice," and "the exact penalties, at issue in *Gilardi*" and other cases brought by for-profit corporations. Pl. Br. 29; *see also* Pl. Br. 30 (citing *Korte* v. *Sebelius*, 735 F.3d 654 (7th Cir. 2013), *petition for cert. pending*, No. 13-937; *Hobby Lobby Stores, Inc.* v. *Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (en banc), *cert. granted*, 134 S. Ct. 678 (2013)).  Unlike the plaintiffs in those cases, the plaintiffs here need not "contract, arrange, pay, or refer for contraceptive

24

coverage" to which they have religious objections.  78 Fed. Reg. at 39,874.  They

"need not place contraceptive coverage into 'the basket of goods and services that

constitute [their] healthcare plan[s].'"  JA 166 (quoting *Gilardi*, 733 F.3d at 1217).

The district court in *Notre Dame* observed that the Seventh Circuit emphasized

this distinction in *Korte* itself, "when it stated that the lack of an exemption or

accommodation for the for-profit plaintiffs was 'notabl[e],' suggesting that the case

might well have come out differently had the *Korte* plaintiffs had access to the

accommodation now available to [eligible organizations]."  *Notre Dame*, _ F. Supp. 2d

_, 2013 WL 6804773, *9 (quoting *Korte*, 735 F.3d at 662).  The Seventh Circuit directly

addressed this issue in *Notre Dame*, where the Seventh Circuit concluded that nothing

in *Korte* supported the plaintiff's challenge to the accommodations.  *University of Notre*

*Dame* v. *Sebelius*, _ F.3d _, 2014 WL 687134, *11 (7th Cir. Feb. 21, 2014) ("Notre Dame

can derive no support from our decision in *Korte* v. *Sebelius*, 735 F.3d 654 (7th Cir.

2013), heavily cited in the university's briefs.").

Plaintiffs declare it "irrelevant that the actions at issue in *Gilardi* were slightly

different than in this case, since the only question is whether the Government is

coercing Plaintiffs into taking actions that violate their religious beliefs."  Pl. Br. 18.

In plaintiffs' view, it is thus immaterial whether they are required to offer and pay for

contraceptive coverage or whether they may decline to do so.  On this reasoning, a

conscientious objector could object not only to his own military service, but also to

opting out, on the theory that his opt-out would "'trigger' the drafting of a

25

replacement who was not a conscientious objector." *Notre Dame*, _ F.3d _, 2014 WL 687134, *9. "That seems a fantastic suggestion," yet, "confronted with this hypothetical at the oral argument" in *Notre Dame*, the plaintiff's counsel "acknowledged its applicability and said that drafting a replacement indeed would substantially burden the [conscientious objector's] religion." *Ibid.*

Nothing in the for-profit cases on which plaintiffs rely, or in the pre-*Smith* case law that RFRA restored, supports the remarkable contention that opting out of an obligation may itself be deemed a substantial burden if someone else will take the objector's place. *See, e.g., Korte* at 735 F.3d at 687 (emphasizing that the plaintiff corporations "are asking for relief from a regulatory mandate that coerces *them* to pay for something—insurance coverage for contraception") (court's emphasis); *Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 710-712 (1981) (explaining that the plaintiff was substantially burdened because he was not able to opt out of the job in which he was "engaged directly in the production of weapons"); *see also Tilton* v. *Richardson*, 403 U.S. 672, 689 (1971) (plurality opinion) (rejecting the plaintiffs' claim that "the Free Exercise Clause is violated because they are compelled to pay taxes, the proceeds of which in part finance grants" to religiously-affiliated colleges to which they objected, on the ground that the plaintiffs were "unable to identify any coercion directed at the practice or exercise of their religious beliefs"); Senate Report 12

(expressly stating that RFRA was not intended to "change the law" as articulated in *Tilton*).[3]

Plaintiffs' substantial burden analysis is without discernible limits, as underscored by the objections advanced by the plaintiffs that offer coverage under the Archdiocese's self-insured "church plan." Group health plans that are "church plan[s]" as defined in the statute are exempt from regulation under ERISA (unless they elect to be covered). *See* 29 U.S.C. § 1003(b)(2); *see also* 29 U.S.C. § 1002(33) (definition of church plan); 26 U.S.C. § 410(d) (election provision). In the absence of an election to be covered, ERISA provides no authority to regulate either the church plan or the third party administrator of a church plan. Thus, after these plaintiffs inform the third party administrator that they will not provide contraceptive coverage, the third party administrator is under no legal compulsion to provide that coverage. These plaintiffs did not offer any evidence to show that the third party administrator of the Archdiocese plan would voluntarily provide such coverage, and thus failed to establish standing to challenge the accommodation. JA 494-499. In any event, a

---

[3] Likewise, in *Board of Education* v. *Allen*, 392 U.S. 236 (1968), the plaintiffs challenging a state program providing textbooks to religious schools contended that the program violated the Free Exercise Clause because, "[t]o the extent books are furnished for use in a sectarian school operated by members of one faith, members of other faiths and non-believers are thereby forced to contribute to the propagation of opinions which they disbelieve" and that this was "no less an interference with religious liberty than forcing a man to attend a church." Br. of Appellants 35, *Allen*, *supra* (No. 660). The Court rejected that contention, holding that such a claim of indirect financial support did not constitute coercion of the plaintiffs "as individuals in the practice of their religion." *Allen*, 392 U.S. at 249.

27

voluntary undertaking by a private third party to provide contraceptive coverage could not substantially burden these plaintiffs' exercise of religion.

### 3. The specific "actions or forbearances" cited by plaintiffs as burdening their exercise of religion underscore that their objections are to the duties imposed on third parties.

**a.** Although plaintiffs repeatedly describe themselves as directing, permitting, or facilitating the provision of contraceptive coverage, the six specific "actions or forbearances" (Pl. Br. 28) itemized at page 27 of their brief confirm that the eligible organizations do no more than provide their insurance issuer or third party administrator with a form stating that the organizations are not required to provide contraceptive coverage and are choosing not to do so.

(1)  Plaintiffs state that they must "[p]ay premiums or fees to a third party authorized to provide their employees with the mandated coverage," but they do not contend that the regulations require them to pay premiums or claims for contraceptive coverage or to administer such coverage.  As discussed above, the regulations prohibit insurance issuers and third party administrators from imposing on an eligible organization any premium, fee, or other charge, directly or indirectly, with respect to payments for contraceptive services.  *See* 45 C.F.R. § 147.131(c)(2) (insured plans); 29 C.F.R. § 2590.715-2713A(b)(2)(i) and (ii) (self-insured plans).  Plaintiffs object only to the legal obligations of these third parties, which must separately make payments for contraceptives available.

28

(2)  Plaintiffs state that they will have to "[o]ffer enrollment paperwork for employees to enroll in a plan overseen by a third party authorized to provide the objectionable coverage," but they do not contend that the regulations require them to offer paperwork for contraceptive coverage.  The regulations make the insurance issuer and the third party administrator responsible for all paperwork required in connection with claims for contraceptive coverage.  *See* 45 C.F.R. § 147.131(d) (insured plans); 29 C.F.R. § 2590.715-2713A(d) (self-insured plans).  The challenged regulations do not require plaintiffs to offer any additional or different "enrollment paperwork" from what they would provide if the regulations did not exist, if they were exempt religious employers, or if they obtained the relief that they seek here.

(3)  Plaintiffs state that they will be required to "[s]end (or tell employees where to send) health-plan-enrollment paperwork to a third party authorized to provide the objectionable coverage."  This assertion is a variation of the previous contention that plaintiffs would have to provide employees with paperwork in connection with their own health plans.  It fails for the same reason.  It is the obligation of the health insurance issuer or third party administrator to provide notice of the availability of separate payments for contraceptive services.  This notice must be "separate from" materials that are distributed in connection with the eligible organization's group health coverage, and the notice must make clear that the eligible organization is neither administering nor funding the contraceptive benefits.  45 C.F.R. § 147.131(d); 29 C.F.R. § 2590.715-2713A(d).

29

(4)  Plaintiffs state that they must "[i]dentify health plan beneficiaries for a third party authorized to provide the objectionable coverage."  This assertion is another variation of the paperwork argument.  The insurance issuer and third party administrator already have the information they need to make separate payments for contraceptive services.  JA 154 n.3; JA 481 n.12.  The regulations impose no additional requirement on plaintiffs.

(5) & (6) Plaintiffs' remaining two objections concern aspects of the accommodation for eligible organizations that are self-insured (in contrast to organizations such as Catholic University and PFL, which offer health coverage through insured plans).  Plaintiffs state that they must "[r]efrain from canceling an insurance arrangement with a third party authorized to provide the mandated coverage" and "[r]efrain from attempting to influence a third party's decision to provide the mandated coverage."

These arguments concern the issues that are presented by the government's cross-appeal.  The district court in *RCAW* accepted the RFRA claim asserted by Thomas Aquinas College, which offers health coverage through a self-insured plan, because the court mistakenly believed that the regulations impose "a duty upon the religious organization to contract with a willing third-party administrator that will arrange for the payments for contraceptives."  JA 453.  The court opined that, if the third party administrator of the College's plan were to terminate its contractual relationship with the plan sponsor, the College would be required to "either shop

30

around to find a new third-party administrator that will assume responsibility for the coverage or proceed without a third-party administrator and await instructions from the government on how it can otherwise satisfy its obligations." JA 488-489. The court stated that, in its view, "the obligation to take affirmative steps to identify and contract with a willing third-party administrator if the existing third-party administrator declines forces the religious organization to *do* something to accomplish an end that is inimical to its beliefs." JA 490 (court's emphasis).

This ruling was premised on a misunderstanding of the regulations, which do not impose "a duty upon the religious organization to contract with a willing third-party administrator that will arrange for the payments for contraceptives." JA 453. Nor would the regulations require the College to "shop around" for a third party administrator that is willing to provide or arrange for the payments for contraceptives if, hypothetically, the third party administrator of the plan (Benefits Allocation Systems) were to terminate its contract with the plan sponsor. To the contrary, the Departments established an enforcement safe harbor for an eligible organization with a self-insured plan that does not have a third party administrator. The Departments indicated that they "will provide any such plan with a safe harbor from enforcement of the contraceptive coverage requirement, contingent on: (1) the plan submitting to HHS information . . . showing that it does not use the services of a third party administrator; and (2) if HHS agrees that the plan does not use the services of a third party administrator, the plan providing notice to plan participants and beneficiaries in

31

any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each applicable plan year, indicating that it does not provide benefits for contraceptive services." 78 Fed. Reg. at 39,880-39,881.

In any event, nothing in the record suggests that Benefits Allocation Systems, which is the third party administrator of the College's plan, intends to terminate its contract with the plan sponsor. Benefits Allocation Systems has not raised any objection to the requirement that it provide or arrange for separate payments for contraceptive services.[4] A legal provision "is not to be upset upon hypothetical and unreal possibilities, if it would be good upon the facts as they are." *Pullman Co.* v. *Knott,* 235 U.S. 23, 26 (1914).

The sixth point that plaintiffs raise in their attempt to state a RFRA claim refers to a provision of a regulation that the district court in *RCAW* invalidated as a restriction on protected speech. The district court interpreted one aspect of the accommodation for self-insured organizations in a way that would restrict protected speech, and then invalidated that portion of the regulation as a violation of the Speech Clause of the First Amendment. JA 520-521.

The relevant regulation states that an eligible organization that is self-insured "must not, directly or indirectly, seek to interfere with a third party administrator's

---

[4] The website for Benefits Allocation Systems indicates that it has more than 4,000 clients and serves a wide array of industries. *See* www.basusa.com/about.

arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, *and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements*." 29 C.F.R. § 2590.715-2713A(b)(1)(iii) (emphasis added).  Over the government's objection, the district court misinterpreted the italicized language to impose a "content-based limit on the religious organizations involved that directly burdens, chills, and inhibits their free speech," JA 520-521, and then proceeded to invalidate that portion of the regulation as an infringement on protected speech.

The quoted regulation makes no reference to speech, however, and it is not properly interpreted to prohibit protected speech.  Indeed, the preamble states that "[n]othing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78 Fed. Reg. at 39,880 n.41.  The two parts of the regulation address two different types of improper conduct.  The first part, addressing efforts "to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries," prohibits an employer from obstructing the provision of benefits that the third party administrator is attempting to provide.  The second part, addressing efforts to "influence the third party administrator's decision to make any such arrangements," is meant only "to prevent a self-certifying organization from using its economic power to coerce a third-party administrator" into not fulfilling its legal obligation to provide contraceptive coverage.  JA 521-522; *see NLRB* v. *Gissel Packing*

*Co.*, 395 U.S. 575, 617 (1969) (rejecting First Amendment challenge to prohibition on "threat of reprisal or force or promise of benefit" intended to "coer[ce] . . . employees in the exercise of their right to self-organization"); *see also United States* v. *Williams*, 553 U.S. 285, 298 (2008) (no First Amendment protection for direct inducement of illegal conduct). The *RCAW* court was therefore incorrect that the regulation would prohibit "any attempt to calmly discuss the moral implications of providing contraception with a third-party administrator." JA 522.

"An agency's interpretation of its regulations is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Town of Barnstable, Mass.* v. *FAA*, 740 F.3d 681, 687 (D.C. Cir. 2014) (quoting *Auer* v. *Robbins*, 519 U.S. 452, 461 (1997)). That principle has particular force where, as here, the government's interpretation avoids a constitutional issue that a different interpretation would present. In *Weaver* v. *U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), this Court accepted the government's interpretation of a regulation "in light of the constitutional difficulties entailed by reading [the regulation] more broadly than suggested by the government." *Id.* at 1438. The Court emphasized it was, "quite simply, reluctant to find burdens on speech that the government eschews any intention to impose." *Ibid.*

**b.** In addition to the six purported "actions or forbearances" that plaintiffs itemize at page 27 of their brief, the self-insured plaintiffs separately note (Pl. Br. 25) that the form provided to a third party administrator "will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for

contraceptive benefits," 78 Fed. Reg. at 39,879, and will serve as "an instrument under which the plan is operated," 29 C.F.R. § 2510.3-16(b). They suggest that this aspect of the accommodation for self-insured organizations raises concerns that are not presented by the accommodation for insured organizations.

The *RCAW* court correctly concluded that nothing in these provisions, which reflect the technical intricacies of ERISA, "changes the fact that any actions the third-party administrator takes with respect to contraceptive coverage must be completely independent from the eligible organization." JA 491; *see generally* JA 489-492. The section of the preamble from which plaintiffs quote explains that the self-certification is "a document notifying the third party administrator(s) that the eligible organization will not provide, fund, or administer payments for contraceptive services," and therefore is "one of the instruments under which the employer's plan is operated under ERISA section 3(16)(A)(i)." 78 Fed. Reg. at 39,879. The form directs third party administrators to their own "obligations set forth in the[] final regulations" and makes clear that the eligible organization has no such obligations. *Ibid.*; *see also* 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(A) and (B) (form "shall include notice" that "[t]he eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services" and that "[o]bligations of the third party administrator are set forth in [Department of Labor regulations]"). The preamble explains that the third party administrator's legal obligations derive from ERISA section 3(16). Insofar as

35

the result of an eligible organization's opting out is that the third party administrator has its own legal obligations under applicable regulations to act in the employer's stead, the form "*will be treated* as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits[.]"  78 Fed. Reg. at 39,879 (emphasis added).  The preamble notes that "[t]he Departments have determined that the ERISA section 3(16) approach most effectively enables eligible organizations to avoid contracting, arranging, paying, or referring for contraceptive coverage after meeting the self-certification standard, while also creating the fewest barriers to or delays in plan participants and beneficiaries obtaining contraceptive services without cost sharing." *Ibid.*

In any event, if an employer objects to particular aspects of the accommodation for *self-insured* plans, it is free to offer its employees an *insured* plan, as Catholic University and PFL do.  This option obviates any objection that is based on the particulars of the accommodation for self-insured organizations.  *See Tony & Susan Alamo Found.* v. *Sec'y of Labor*, 471 U.S. 290, 303-05 (1985) (option to compensate employees by furnishing room and board obviates religious objection to paying cash wages).  An eligible organization may have business reasons to prefer self-insurance over an insured plan, but the Supreme Court has held that such considerations do not establish a substantial burden on the exercise of religion.  *See Braunfeld* v. *Brown*, 366 U.S. 599, 605 (1961) (rejecting Orthodox Jewish merchants' free exercise challenge to

36

Sunday closing law that "operates so as to make the practice of their religious beliefs more expensive").

### 4. Plaintiffs' analysis disregards the burdens placed on plan participants and beneficiaries if plaintiffs' position were accepted.

Plaintiffs' analysis also erroneously assumes that the RFRA inquiry should evaluate the nature of the asserted burden placed on their exercise of religion without regard to the burden on third parties that would result from accepting their position. That approach is at odds with the pre-*Smith* jurisprudence incorporated by RFRA and with both of the free-exercise decisions cited in RFRA itself, *see* 42 U.S.C. § 2000bb(b)(1), which emphasized the importance of third-party interests to the free-exercise analysis. In *Sherbert* v. *Verner*, 374 U.S. 398 (1963), the Court accepted the free exercise claim only after stressing that "recognition of the [employee's] right to unemployment benefits under the state statute" did not "serve to abridge any other person's religious liberties." *Id.* at 409. In *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972), the Court held that the Free Exercise Clause required an exemption from compulsory education laws for Amish parents only after determining that the parents had "carried" the "difficult burden of demonstrating the adequacy of their alternative mode of continuing informal vocational education," thus establishing that there was only a "minimal difference between what the State would require and what the Amish already accept." *Id.* at 235-36; *see id.* at 222. Moreover, the Court in *Yoder* emphasized that its holding would not extend to a case in which an Amish child affirmatively

wanted to attend school over his parents' objection. *See id.* at 231-32. And, in *United States* v. *Lee,* 455 U.S. 252 (1982), the Court's rejection of the employer's free-exercise claim relied on the fact that exempting the employer from the obligation to pay Social Security taxes would "operate[] to impose the employer's religious faith on the employees," who would be denied the benefits to which they were entitled by federal law. *Id.* at 261.

RFRA is not properly interpreted to create tension with the approach of these pre-*Smith* cases.[5] Indeed, the Supreme Court has stressed that in "[p]roperly applying" the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which was modeled on RFRA, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries[.]" *Cutter* v. *Wilkinson*, 544 U.S. 709, 720 (2005).[6] *Cf. Trans World Airlines, Inc.* v. *Hardison*, 432 U.S. 63, 80 (1977) (Title VII's

---

[5] The types of accommodations cited in the debates prior to enactment of RFRA did not impose substantial costs or burdens on third parties. *See, e.g.,* 139 Cong. Rec. E1234-01 (daily ed. May 11, 1993) (statement of Rep. Cardin) (citing as examples of contemplated accommodations ensuring burial of veterans in "veterans' cemeteries on Saturday and Sunday . . . if their religious beliefs required it" and precluding autopsies "on individuals whose religious beliefs prohibit autopsies"); 139 Cong. Rec. S14350-01 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch) (contemplated accommodations include allowing parents to home school their children, allowing individuals to volunteer at nursing homes, and allowing families to decline autopsies). Such accommodations do not require third parties to forfeit federal protections or benefits to which they are entitled.

[6] For this reason, *Cutter* rejected an Establishment Clause challenge to RLUIPA. Indeed, the Supreme Court has held that, under certain circumstances, an accommodation that imposes burdens on employees can violate the Establishment Clause. *See Estate of Thornton* v. *Caldor, Inc.*, 472 U.S. 703, 708-11 (1985) (holding that a

*Continued on next page.*

reasonable-accommodation requirement does not entitle employee to a religious accommodation that would come at the expense of other employees).

5.      **It is the province of this Court to consider whether regulations that allow plaintiffs to decline to provide contraceptive coverage "substantially" burden their exercise of religion.**

Although a court accepts a litigant's sincerely held religious beliefs, it must assess the nature of a claimed burden on religious exercise to determine whether, as a legal matter, that burden is "substantial" under RFRA. Plaintiffs cannot preclude that inquiry by collapsing the question of substantial burden into the sincerity of their beliefs. Were that the case, any individual or religious non-profit institution would be able not only to declare a sincerely held religious belief but also to demand absolute deference to its assessment of what constitutes a substantial burden on that belief.

Nevertheless, plaintiffs are clear that they believe that a court is bound to accept their position that the opt-out provision "substantially burden[s] [their] exercise of religion." 42 U.S.C. § 2000bb-1. Accordingly, plaintiffs assert that "the courts' conclusion that the accommodation effectively severs an organization from participation in the provision of the contraceptive coverage . . . rests on an impermissible assessment of Plaintiffs' religious beliefs." Pl. Br. 36 (quotation marks and citations omitted).

---

statute requiring an employer to accommodate an employee's Sabbath observance without regard to the burden such an accommodation would impose on the employer or other employees violated the Establishment Clause).

Plaintiffs' proposition does not accord with settled law.  Whether a burden is "substantial" under RFRA is a question of law, not a "question[] of fact, proven by the credibility of the claimant."  *Mahoney* v. *Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011); *see, e.g., Bowen* v. *Roy*, 476 U.S. 693, 701 n.6 (1986) ("Roy's religious views may not accept this distinction between individual and governmental conduct," but the law "recognize[s] such a distinction"); *Lyng* v. *Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448 (1988) (similar); *Kaemmerling* v. *Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) ("[a]ccepting as true the factual allegations that Kaemmerling's beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened").

Plaintiffs' attempt to distinguish *Kaemmerling* as a case in which a plaintiff was not required to take any act is unavailing.  They assert that the plaintiff in that case "did not have a religious objection to any action he was forced to take, but only 'to the government extracting DNA information from . . . specimen[s]' *it already had*."  Pl. Br. 39-40 (quoting *Kaemmerling,* 553 F.3d at 679) (plaintiffs' emphasis).  That is not an accurate account of the decision.  Kaemmerling was required to give a sample and filed suit before he had done so.  The law at issue in that case required Kaemmerling to give "'a tissue, fluid, or other bodily sample . . . on which a[n] . . . analysis of the [DNA] identification information' can be carried out[.]"  553 F.3d at 673.  That sample was to be used by the FBI to "creat[e] the donor's unique DNA profile" and "record[] a copy of the profile in the CODIS [database]."  *Ibid.*  Kaemmerling

40

"alleged that . . . *submitting to* DNA 'sampling, collection and storage with no clear limitations of use' is repugnant to his strongly held religious beliefs" against "the collection and retention of his DNA information."  553 F.3d at 674 (emphasis added); *see also id.* at 678.  He was required to "submit[] to DNA 'sampling, collection and storage'" because he had not already given a sample.  The government did not "*already ha[ve]*" (Pl. Br. 40) a specimen.[7]

This Court examined Kaemmerling's claims that he did not object, in and of itself, to the act of giving a tissue sample or any similar "bodily violation" but rather "to collection of the DNA information contained within any sample."  *Kaemmerling*, 553 F.3d at 678.  In the full sentence that plaintiffs truncate in their brief (Pl. Br. 40), the Court explained that, "[g]iven these representations, we understand Kaemmerling's objection to 'DNA sampling and collection' not to be an objection to

_____

[7] Kaemmerling had sought a preliminary injunction and temporary restraining order before a sample was collected.  *See, e.g.,* Opening Brief of Appointed *Amicus Curiae*, 2008 WL 2520867, at * at *8, *51-*52 (discussing motion for TRO and risk that Kaemmerling would be forced to give a sample).  Before this Court, he posited that he would be forced "either [to] comply with the Act or . . . to violate a sincerely held religious belief," and that "forced participation in the seizure of blood for storage, [and] DNA sampling" was a substantial burden.  Brief of Appellant, 2008 WL 2520866, at *19, *21.  A court-appointed *amicus curiae* supporting the *pro se* plaintiff explained, based on the complaint and record, that Kaemmerling objected to taking an active role in the process of DNA analysis by "'*submitting to* DNA sampling, collection and storage.'"  Opening Brief of Appointed *Amicus Curiae*, 2008 WL 2520867, at *41 (quoting App. 14-15) (emphasis added); *see also id.* at *40-*41 (urging that Act "'forc[es] [him] *to provide* DNA samples'" and stating that his "'religious beliefs do not allow [him] *to consent* to DNA sampling'") (quoting App. 72) (emphasis added).

41

the BOP collecting any bodily specimen that contains DNA material such as blood, saliva, skin, or hair, but rather an objection to the government extracting DNA information from the specimen." *Id.* at 679.   Concluding that Kaemmerling had failed to allege a "substantial burden" under RFRA, this Court explained that "[t]he extraction and storage of DNA information are entirely activities of the FBI, in which Kaemmerling plays no role" and "which occur after" he has given a tissue sample. *Ibid.* "The government's extraction, analysis, and storage of Kaemmerling's DNA information does not call for Kaemmerling to modify his religious behavior in any way[.]" *Ibid.*

Plaintiffs' discussion of other case law is wide of the mark.  In *Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981), for example, the plaintiff's "religious beliefs prevented him from participating in the production of war materials." *Id.* at 709.  When his employer placed him in "a department that fabricated turrets for military tanks," the plaintiff looked for openings in departments not "engaged directly in the production of weapons," and, when he could not find one, quit his job. *Id.* at 710.  He was denied unemployment compensation on the ground that "a termination motivated by religion is not for 'good cause' objectively related to the work." *Id.* at 711-13.

The Supreme Court disagreed and held that the state could not deny unemployment compensation "because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to

42

violate his beliefs[.]" *Id.* at 717-18. Notably, Thomas objected to *his* "fabricat[ing] turrets for military tanks." *Id.* at 710; *see id.* at 711 (finding that he objected to "producing or directly aiding in the manufacture of items used in warfare"). He did not object to *opting out* of doing so. Indeed, Thomas looked in the same company for jobs not "engaged directly in the production of weapons." *Id.* at 710; *see also id.* at 711-12 ("'Claimant continually searched for a transfer to another department which would not be so armament related'"). The burden in *Thomas* thus resulted from the absence of the type of opt-out mechanism available in this case. Thomas did not suggest that his religious rights would be burdened if, as a consequence of his actions, *another employee* was assigned to work on armaments manufacture.

In short, while this Court does not scrutinize the sincerity of plaintiffs' religious beliefs, it properly determines whether the challenged regulations impose a substantial burden on those beliefs as provided for by RFRA and pre-*Smith* free-exercise law. Plaintiffs may decline to provide contraceptive coverage without facing any penalties. RFRA does not allow plaintiffs to block the government and third parties from making payments for contraceptive services.

### B. Plaintiffs' Claims Would Fail Even If the Accommodations Were Subject to RFRA's Compelling-Interest Test.

Plaintiffs' claims would fail even if the accommodations were subject to RFRA's compelling-interest test. In *Gilardi*, a divided panel of this Court held that the requirement that employer-sponsored plans cover recommended preventive services

without cost sharing is not the least restrictive means of furthering compelling governmental interests because plans are not subject to this requirement while they retain grandfathered status and because small employers are not subject to potential tax liability if they do not offer health coverage. *Gilardi*, 733 F.3d at 1222-23. The government has sought Supreme Court review in *Gilardi* and has asked the Supreme Court to hold its petition pending its resolution of *Hobby Lobby* and *Conestoga*, which present the same issue. We respectfully submit that *Gildari* is incorrect for the reasons set out in Judge Edwards' dissenting opinion and the government's Supreme Court briefs, but we recognize that *Gilardi* controls at this juncture with respect to the plans offered by for-profit corporations.

In district court, the government further conceded that *Gilardi* would control the application of RFRA's compelling-interest test if the accommodations were deemed to impose a substantial burden on plaintiffs' exercise of religion. *See, e.g.*, R.31 at 17 (*RCAW*). The *PFL* court had no occasion to decide that question, however, and the *RCAW* court correctly noted that the analysis of the accommodations should differ from the analysis of the contraceptive-coverage provision itself. JA 494 n.21.

It is difficult to imagine a means of furthering the government's objectives that is less restrictive than an accommodation that allows objectors to opt out. Indeed, after the district court decisions were issued in these cases, the *RCAW* plaintiffs filed a petition for a writ of certiorari before judgment that concedes that "[t]he

44

Government could provide the contraceptive services or insurance coverage directly to plaintiffs' employees, or work with third parties—be it insurers, health care providers, drug manufactures, or non-profits—to do so without requiring plaintiffs' active participation." Petition for a Writ of Certiorari Before Judgment 25, *Roman Catholic Archbishop of Washington* v. *Sebelius*, No. 13-829 (S. Ct.) (quotation marks and citation omitted).

Indeed, the government's ability to accommodate religious concerns in this and other schemes depends on its ability to fill the gaps created by the accommodations. Plaintiffs' analysis, on the other hand, asserts that it is insufficient to permit an objector to opt out of an objectionable requirement; the government must, in their view, fundamentally restructure its operations and may not shift plaintiffs' obligations to a third party. As the Supreme Court admonished in its pre-*Smith* decisions, "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen*, 476 U.S. at 699-700. Plaintiffs' reasoning would fundamentally undermine the means by which the government accommodates religious concerns without impairing its own operations.

45

II.  **Plaintiffs Have Not Identified Any Violation of Their Constitutional Rights.**

A.  **The Regulations Do Not Violate the Free Exercise Clause.**

The Free Exercise Clause is not implicated by laws that are neutral and generally applicable.  *See Employment Div.* v. *Smith*, 494 U.S. 872, 879 (1990).  It prohibits only laws with "the unconstitutional object of targeting religious beliefs and practices."  *City of Boerne* v. *Flores*, 521 U.S. 507, 529 (1997); *see id.* at 530 (Free Exercise clause prohibits "laws passed because of religious bigotry"); *id.* at 535 (explaining that if a law "disproportionately burdened a particular class of religious observers," the relevance under the Free Exercise clause is to suggest "an impermissible legislative motive").  "Neutrality and general applicability are interrelated."  *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 531 (1993).   A law is not neutral "if the object of the law is to infringe upon or restrict practices because of their religious motivation."  *Id.* at 533.  A law is not generally applicable if it "in a selective manner impose[s] burdens only on conduct motivated by religious belief."  *Id.* at 543.

Even assuming *arguendo* that the contraceptive-coverage provision burdens plaintiffs' exercise of religion, there would be no violation of the Free Exercise Clause because that burden is imposed by a neutral and generally applicable requirement. JA 167-172; JA 499-508.  Although plaintiffs focus on the contraceptive-coverage provision, the women's preventive health care requirements include many services unrelated to contraception, many of which plaintiffs do not appear to contest.  The

comprehensive approach to women's health issues laid out in the Affordable Care Act demonstrates that there is no intent to regulate religion or target religious exercise.

The purpose of the preventive-services coverage provision is "to advance the goals of safeguarding public health and ensur[e] that women have equal access to health care." *Catholic Diocese of Nashville* v. *Sebelius*, _ F. Supp. 2d _, 2013 WL 6834375, *6 (M.D. Tenn. Dec. 26, 2013), *appeal pending*, No. 13-6640 (6th Cir.) (citing 78 Fed. Reg. at 39,872); *see, e.g.,* 155 Cong. Rec. S11985, S11986 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski) (sponsor explaining that purpose is to "guarantee[] women access to lifesaving preventive services and screenings," and to remedy the fact that "[w]omen are more likely than men to neglect care or treatment because of cost"); 155 Cong. Rec. S12265, S12271 (daily ed. Dec. 3, 2009) (statement of Sen. Franken) ("The problem [with the current bill] is, several crucial women's health services are omitted. [The Women's Health Amendment] closes this gap."); 155 Cong. Rec. S12021-02, S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand) ("[I]n general women of childbearing age spend 68 percent more in out-of-pocket health care costs than men. . . . This fundamental inequity in the current system is dangerous and discriminatory and we must act.").

The "neutral purpose of the regulations—to make contraceptive coverage available to women—is not altered because the legislature chose to exempt some religious institutions and not others." JA 169. "On the contrary, 'the religious employer exemption presents a strong argument in favor of neutrality, demonstrating

47

that the "object of the law" was not to 'infringe upon or restrict practices because of their religious motivation.'" *Ibid.* (quoting *O'Brien* v. *U.S. Dep't of Health & Human Servs.*, 894 F. Supp. 2d 1149, 1161 (E.D. Mo. 2012) (quoting *Lukumi*, 508 U.S. at 533)).

The district courts correctly rejected plaintiffs' contention that the preventive-services coverage provision is not generally applicable because of statutory provisions that pertain to small businesses and grandfathered plans. JA 171; JA 507. These provisions "apply to all employers, including religious employers" and "are not imposed selectively against conduct motivated by religious belief." *Michigan Catholic Conference*, _ F. Supp. 2d _, 2013 WL 6838707, *9. The fact that "'categorical exemptions exist does not mean that the law does not apply generally.'" *Ibid.*; *see Lee*, 455 U.S. at 260-61 (finding that social security tax requirements were generally applicable although there were categorical exemptions).

Plaintiffs' reliance on *Lukumi* underscores the error in their reasoning. In that case, the legislature specifically targeted the religious exercise of members of a single church (Santeria) by enacting ordinances that used terms such as "sacrifice" and "ritual," *Lukumi*, 508 U.S. at 533-34, and prohibited few, if any, animal killings other than Santeria sacrifices, *id.* at 535-36. The statute was drawn so "that few if any killings of animals are prohibited other than Santeria sacrifice, which is proscribed because it occurs during a ritual or ceremony and its primary purpose is to make an offering to the orishas, not food consumption." *Id.* at 536. "Indeed, careful drafting ensured that, although Santeria sacrifice is prohibited, killings that are no more

48

necessary or humane in almost all other circumstances are unpunished." *Ibid.*
*Lukumi* does not remotely suggest that an exemption from the contraceptive-coverage
provision for plans offered by churches and other houses of worship, or provisions
that pertain to small employers and grandfathered plans, are evidence that the
government targeted the religious practices of any church or denomination.[8]

### B. The Regulations Do Not Violate Plaintiffs' Freedom of Speech or Expressive Association.

"The government has not compelled plaintiffs to speak, nor has it violated
their rights to expressive association." JA 178.

**1.** Plaintiffs' "compelled speech" argument has three prongs. First, they argue
that the regulations require them "to authorize and facilitate coverage for 'counseling'
related to contraceptive services." Pl. Br. 54. As an initial matter, this argument fails
because the accommodations permit plaintiffs to opt out of contraceptive coverage.
Moreover, even if plaintiffs could not opt out, the argument would fail because the
contraceptive-coverage provision regulates the terms of group health plans, not the
content of communications between patients and their healthcare providers. JA 176
n.7. The regulations require coverage of "'education and counseling for all women
with reproductive capacity' as prescribed by a provider," 77 Fed. Reg. at 8725 (quoting

---

[8] Plaintiffs also rely on Third Circuit precedent, but the Third Circuit has
recognized that "[a] law is 'neutral' if it does not target religiously motivated conduct
either on its face or as applied in practice." *Blackhawk* v. *Pennsylvania*, 381 F.3d 202,
209 (3d Cir. 2004) (Alito, J.).

HRSA Guidelines), and do not require that this counseling encourage any particular service. Receiving medical care often involves a conversation between a patient and a doctor or a patient and a pharmacist. That does not transform any required health coverage into a compelled speech case. *See Rumsfeld* v. *Forum for Academic & Inst. Rights, Inc.,* 547 U.S. 47, 61-62 (2006).

The second prong of plaintiffs' "compelled speech" argument urges that the act of opting out of providing contraceptive coverage is itself speech and "deprives them of the freedom to speak on the issue of abortion and contraception on their own terms, at a time and place of their own choosing." Pl. Br. 55. This assertion is inexplicable. The requirement to complete an opt-out form does not constrain plaintiffs' speech on any topic. JA 174. "Nothing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78 Fed. Reg. at 39,880 n.41. Moreover, by opting out, plaintiffs would explicitly proclaim their objection to contraception. JA 175.

Third, plaintiffs note that plan participants and beneficiaries will receive "written notice" of the availability of separate payments for contraceptives. Pl. Br. 56. However, the health insurance issuer or third party administrator itself provides this notice, and it must do so "separate from" materials that are distributed in connection with the eligible organization's group health coverage. 45 C.F.R. § 147.131(d); 29 C.F.R. § 2590.715-2713A(d). Moreover, the notice must make clear

that the eligible organization is neither administering nor funding the contraceptive

benefits. *Ibid.*[9]

**2.**   PFL does not advance its position by declaring that the accommodation

infringes upon its right to "expressive association." Pl. Br. 51-53. "The government

violates expressive association rights under the First Amendment by directly

interfering with an association's composition by forcing them to accept members or

hire employees who would 'significantly affect [the association's] expression.'" JA 177

(quoting *Boy Scouts of America* v. *Dale*, 530 U.S. 640, 656 (2000)). "It may also infringe

on the freedom of expressive association by passing laws requiring disclosure of

anonymous membership lists, or imposing penalties or withholding benefits based on

membership in a disfavored group." *Ibid.* (citing *Brown* v. *Socialist Workers '74 Campaign

Comm.*, 459 U.S. 87, 101-02 (1982); *Healy* v. *James*, 408 U.S. 169, 180-84 (1972)).

"The regulations and accommodations in no way restrict Priests for Life's

members, employees, and donors from associating to express their opposition to

contraception." JA 178. "Nothing about the regulations or the accommodations

force Plaintiffs to accept members or employees it does not desire, nor do they make

group membership less desirable[.]" *Ibid.* "[T]he fact that a third party provides

contraceptive coverage to Priests for Life's employees, separate from Priests for Life

---

[9] Plaintiffs' contention that the regulations impose a "gag rule" on a self-insured organization's speech (Pl. Br. 57 n.15) is addressed above. That argument rests on a misunderstanding of the cited regulation, which does not restrict protected speech. *See* pp. 32-34, *supra*.

or its employer-sponsored health plan, does not affect the group's ability to express its message under the First Amendment, and therefore does not violate its associational rights." *Ibid.*

PFL asserts that the accommodation requires it "to disclose the identity of its employees (and their family members who are beneficiaries of the health care plan) *for the express purpose* of facilitating" contraceptive coverage, Pl. Br. 53 (plaintiff's emphasis), but, as discussed above, the accommodation does not impose such a requirement. The insurer already has the information it needs to make separate payments for contraceptives. *See* JA 154 n.3 & pp. 24-25, *supra.*

In any event, the employees have not objected to having their identities provided to the insurer. This case bears no resemblance to the "anonymous membership lists" cases on which PFL relies. JA 177.

### C. The Regulations Do Not Violate the Establishment Clause or Equal Protection Clause or Interfere with Internal Church Governance.

Plaintiffs' remaining constitutional arguments take issue with the fact that churches (and other houses of worship) are automatically exempt from the contraceptive-coverage provision, whereas other religiously affiliated organizations (such as religiously affiliated colleges and universities) may opt out of providing contraceptive coverage by availing themselves of the accommodations. Contrary to plaintiffs' assertions (Pl. Br. 57-65, 67-69), these regulations do not favor some denominations over others in violation of the Establishment Clause or Equal

Protection Clause, nor do they interfere with internal church governance by "artificially splitting the Catholic Church in two." Pl. Br. 63.

Under the regulations, an organization is a "religious employer" if it "is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). The cited provisions of the Internal Revenue Code refer to churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order.

Although plaintiffs apparently believe that these Internal Revenue Code provisions are unconstitutional, they offer no plausible basis for this contention. Rejecting the same argument, the Seventh Circuit explained that "religious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii), without these advantages being thought to violate the establishment clause." *Notre Dame*, _ F.3d _, 2014 WL 687134, *13 (citing *Walz* v. *Tax Comm'n of the City of New York*, 397 U.S. 664, 666 (1970) (upholding property tax exemptions for real property owned by religious organizations and used exclusively for religious worship)).

Plaintiffs' reliance (Pl. Br. 57-58) on cases such as *Larson* v. *Valente*, 456 U.S. 228, 244 (1982), is entirely misplaced. The statute held unconstitutional in that case was "drafted with the explicit intention" of requiring "particular religious denominations" to comply with registration and reporting requirements while

53

excluding other religious denominations. *Id.* at 254; *see also id.* at 244 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). The Supreme Court in *Larson* contrasted the case with its earlier decision in upholding an exemption from the draft, where "conscientious objector status was available on an equal basis to both the Quaker and the Roman Catholic." *Id.* at 246 n.23 (discussing *Gillette* v. *United States*, 401 U.S. 437 (1971)). Here, too, the religious employer exemption does not grant any denominational preference or otherwise discriminate among religions.

Plaintiffs also object to a longstanding, non-exhaustive, and non-binding list of factors that the IRS uses when determining whether an organization is a church. Pl. Br. 61-62. But plaintiffs do not challenge any determination that has been made using those factors or explain how their objection to those factors bears on the regulation at issue here. The religious employer exemption does not require the government to make any determination, much less to "ask intrusive questions designed to determine whether a group is 'sufficiently religious.'" Pl. Br. 60 (quoting *University of Great Falls* v. *NLRB*, 278 F.3d 1335, 1343 (D.C. Cir. 2002)) (emphasis omitted). Nor do the regulations require the Archdiocese to "expel its affiliates from the Archdiocese's plan." Pl. Br. 64. To the contrary, the regulations permit these affiliated organizations to opt out of providing contraceptive coverage and thus to continue to provide coverage under the Archdiocese's plan.

### D.   The Departments Have Not Misunderstood Their Own Regulations.

Plaintiffs are equally wide of the mark in asserting (Pl. Br. 65-67) that the Departments have misunderstood the religious employer exemption with respect to "multi-employer plans"—plans that, as relevant here, are established or maintained by an entity that qualifies for the religious employer exemption as well as other, non-exempt entities.  The preamble to the final rules correctly explains that "[t]he final regulations continue to provide that the availability of the exemption or an accommodation be determined on an employer-by-employer basis, which the Departments continue to believe best balances the interests of religious employers and eligible organizations and those of employees and their dependents."  78 Fed. Reg. at 39,886.

Plaintiffs take issue with this employer-by-employer approach, asserting that the reference to "group health plan[s]" in the religious employer exemption, 45 C.F.R. § 147.131(a), requires that the exemption be applied on a plan-by-plan basis—in other words, that all employers participating in such a plan must be exempt from the contraceptive coverage requirement regardless of whether they themselves satisfy the "religious employer" criteria.  That is incorrect.  The regulations speak of "group health plan[s]" simply because the contraceptive-coverage requirement, like all of the other preventive-services coverage requirements, applies to group health plans and not to employers themselves.  *See, e.g.*, *id.* § 147.130(a) (generally setting out the

requirement that "a group health plan" must provide coverage for certain preventive services).  Use of the phrase "group health plan" thus provides consistency with the structure of the broader regulatory scheme.  The very title of the relevant subsection—"[r]eligious *employers*," *id.* § 147.131(a) (emphasis added)—indicates that the exemption depends on the nature of the relevant employer.

Contrary to plaintiffs' assertion (Pl. Br. 65), the Departments never suggested that the final regulations would take a plan-by-plan approach.  The passage on which they rely from the advance notice of proposed rulemaking concerned an affiliated organization that itself also qualified as a religious employer.  *See* 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).  Moreover, the notice of proposed rulemaking expressly "propose[d] to make the accommodation or the religious employer exemption available on an employer-by-employer basis." 78 Fed. Reg. at 8467.  Plaintiffs' contention that the Departments' interpretation is "plainly erroneous or inconsistent with the regulation," *Auer*, 519 U.S. at 461, has no merit.

## CONCLUSION

The judgment of the district court in *Priests for Life* should be affirmed.  The

judgment of the district court in *Roman Catholic Archbishop of Washington* should be

affirmed insofar as the court ruled in the government's favor and reversed insofar as

the court ruled in favor of plaintiffs.

Respectfully submitted,


STUART F. DELERY
   *Assistant Attorney General*

RONALD C. MACHEN, JR.
   *United States Attorney*

BETH S. BRINKMANN
   *Deputy Assistant Attorney General*

MARK. B. STERN
ALISA B. KLEIN
*/s/ Adam C. Jed*
ADAM C. JED
   *(202) 514-5089*
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7531*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., N.W.*
   *Washington, D.C.  20530*


MARCH 2014

57

**CERTIFICATE OF COMPLIANCE WITH**
**FEDERAL RULE OF APPELLATE PROCEDURE 32(A)**

I hereby certify that this brief complies with the requirements of Fed. R. App.

P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a

proportionally spaced font.  I further certify that this brief complies with the type-

volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's order of January 29,

2014, because it contains 13,815 words, excluding the parts of the brief exempted

under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

*/s/ Adam C. Jed*
Adam C. Jed

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2014, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Adam C. Jed*
Adam C. Jed