**[ARGUMENT HELD MAY 8, 2014]**

**Nos. 13-5368, 13-5371 & 14-5021**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PRIESTS FOR LIFE,
Plaintiff-Appellant,
and

ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, et al.,
Plaintiffs-Appellants/Cross-Appellees,
v.

SYLVIA M. BURWELL, in her official capacity as
Secretary of Health and Human Services, et al.,
Defendants-Appellees/Cross-Appellants.

On Appeals from the United States District Court for the District of Columbia
(No. 13-1261 (Sullivan, J.) and No. 13-1441 (Berman Jackson, J.))

**SUPPLEMENTAL BRIEF FOR THE APPELLEES/CROSS-APPELLANTS**

JOYCE R. BRANDA
*Acting Assistant Attorney General*

RONALD C. MACHEN, JR.
*United States Attorney*

BETH S. BRINKMANN
*Deputy Assistant Attorney General*

MARK B. STERN
ALISA B. KLEIN
ADAM C. JED
PATRICK G. NEMEROFF
MEGAN BARBERO
*(202) 514-5089*
*Attorneys, Appellate Staff*
*Civil Division, Room 7531*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIR. R. 28(a)(1)

### A.     Parties and *Amici*

The plaintiffs in *Priests for Life* are Priests for Life; Father Frank Pavone; Alveda King; and Janet Morana.  The plaintiffs in *Roman Catholic Archbishop of Washington* are the Roman Catholic Archbishop of Washington; Archbishop Carroll High School, Inc.; Don Bosco Cristo Rey High School of the Archdiocese of Washington, Inc.; Mary of Nazareth Roman Catholic Elementary School, Inc.; Catholic Charities of the Archdiocese of Washington, Inc.; Victory Housing, Inc.; the Catholic Information Center, Inc.; the Catholic University of America; and Thomas Aquinas College.

Defendants in both cases are the U.S. Department of Health and Human Services; Sylvia M. Burwell, in her official capacity as Secretary of Health and Human Services; the U.S. Department of Labor; Thomas E. Perez, in his official capacity as Secretary of Labor; the U.S. Department of the Treasury; and Jacob J. Lew, in his official capacity as Secretary of the Treasury.

Amicus briefs were filed on appeal by Association of Rescue Gospel Missions; Prison Fellowship Ministries; Association of Christian Schools International; American Bible Society; National Association of Evangelicals; Ethics and Religious Liberty Commission of the Southern Baptist Convention; Institutional Religious Freedom Alliance; Lutheran Church-Missouri Synod; the Christian Legal Society; Americans United for Separation of Church and State; American Civil Liberties Union; American Public Health Association; Asian & Pacific Islander American

Health Forum; Asian Americans Advancing Justice; Black Women's Health

Imperative; California Women's Law Center; Forward Together; HIV Law Project;

Ipas; National Asian Pacific American Women's Forum; National Family Planning &

Reproductive Health Association; National Health Law Program; National Latina

Institute for Reproductive Health; National Women and AIDS Collective; National

Women's Health Network and Sexuality Information and Education Council of the

U.S.; American Association of University Women; American Federation of State,

County and Municipal Employees; Ibis Reproductive Health; Merger Watch; NARAL

Pro-Choice America; National Organization for Women Foundation; National

Partnership for Women and Families; National Womens Law Center; Planned

Parenthood Federation of America; Planned Parenthood of Maryland, Inc.; Planned

Parenthood of Metropolitan Washington, DC, Inc.; Population Connection, Raising

Womens Voices for the Health Care We Need; Service Employees International

Union.

    The American Civil Liberties Union filed an amicus brief in district court.

### B.    Rulings Under Review

    The rulings under review in *Priests for Life* are the December 19, 2013 opinion

and order granting the government's motion to dismiss the complaint.  The decision

was issued by the Honorable Emmett G. Sullivan in Case No. 13-1261 (D.D.C.).  *See*

Docket Nos. 35, 36.

    The rulings under review in *Archbishop of Washington* are the December 20, 2013,

judgment and opinion granting in part and denying in part the government's motion

to dismiss, or in the alternative, for summary judgment.  The decision was issued by

the Honorable Amy Berman Jackson in Case No. 13-1441 (D.D.C.).  *See* Docket Nos.

47, 48.

## C.    Related Cases

The *Roman Catholic Archbishop of Washington* case was previously before this

Court.  *See* No. 13-5091 (D.C. Cir. Sept. 6, 2013).

The issues presented in these appeals are also presented in *Belmont Abbey* v.

*Sebelius*, No. 13-cv-1831 (D.D.C.), which has been stayed pending this Court's

decision in these appeals.

The same issues are also presented in the following cases pending before other

courts of appeals:

*Roman Catholic Archdiocese of New York* v. *Burwell*, No. 14-427 (2d Cir.)

*Geneva College* v. *Burwell*, Nos. 13-3536, 14-1374, 14-1376 & 14-1377 (3d Cir.)

*Brandt* v. *Sec'y, U.S. Dep't of HHS*, No. 14-3663 (3d Cir.)

*University of Dallas* v. *Sebelius*, Nos. 14-10241, 14-10661, 14-20112, & 14-40212 (5th Cir.)

*Michigan Catholic Conference* v. *Sebelius*, Nos. 13-2723 & 13-6640 (6th Cir.)

*Legatus* v. *Sebelius*, Nos. 14-1183 & 14-1310 (6th Cir.)

*Grace Schools* v. *Sebelius*, Nos. 14-1430 & 14-1431 (7th Cir.)

*Wheaton College* v. *HHS*, No. 14-2396 (7th Cir.)

*Dordt College* v. *Burwell*, No. 14-2726 (8th Cir)

*Sharpe Holdings, Inc.* v. *HHS*, No. 14-1507 (8th Cir.)

*Archdiocese of St. Louis* v. *Burwell*, No. 14-1316 (8th Cir.)

*Catholic Benefits Association* v. *Burwell*, Nos. 14-6163 & 14-6171 (10th Cir.)

*Colorado Christian University* v. *Burwell*, No. 14-1329 (10th Cir.)

*Dobson* v. *Burwell*, No. 14-1233 (10th Cir.)

*Little Sisters of the Poor* v. *Sebelius*, No. 13-1540 (10th Cir.)

*S. Nazarene Univ.* v. *Sebelius*, No. 14-6026 (10th Cir.)

*Reaching Souls Int'l* v. *Sebelius*, No. 14-6028 (10th Cir.)

*Diocese of Cheyenne* v. *Sebelius*, No. 14-8040 (10th Cir.)

*Archdiocese of Atlanta* v. *Burwell*, Nos. 14-12890 & 14-13239 (11th Cir)

*Eternal Word Television Network* v. *Burwell*, No. 14-12696-C (11th Cir.)

      /s/  Adam C. Jed
      Adam C. Jed

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
PURSUANT TO CIR. R. 28(a)(1)

GLOSSARY

INTRODUCTION .......................................................................................... 1

DISCUSSION .............................................................................................. 4

    The Supreme Court's Decision in *Hobby Lobby* and Order in
    *Wheaton College* and the Interim Final Rules Confirm the Validity
    of the Accommodations ............................................................................ 4

CONCLUSION ........................................................................................... 21

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page**

*Bowen* v. *Roy,*
  476 U.S. 693 (1986) ............................................................................ 16

*\*Burwell* v. *Hobby Lobby Stores, Inc.,*
  134 S. Ct. 2751 (2014) .....................................................2, 3, 4, 5, 6, 11, 13,
                                                    14, 15, 16, 18, 19, 20, 21

*Conestoga Wood Specialties Corp.* v. *U.S. Dep't of Health & Human Servs.,*
  724 F.3d 377 (3d Cir. 2013) .............................................................. 18

*Cutter* v. *Wilkinson,*
  544 U.S. 709 (2005) ............................................................................ 5

*Gilardi* v. *U.S. Dep't of Health & Human Servs.,*
  733 F.3d 1208 (D.C. Cir. 2013), *vacated* 134 S. Ct. 2902 (2014)................................... 13

*Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ........................................................................ 16, 17

*Mahoney* v. *Doe,*
  642 F.3d 1112 (D.C. Cir. 2011)............................................................. 10

*\*Mich. Catholic Conference* v. *Burwell,*
  755 F.3d 372 (6th Cir. 2014), *pet. for reh'g pending* (filed July 25, 2014)....... 2, 10, 11, 13

*Reno* v. *Am. Civil Liberties Union,*
  521 U.S. 844 (1997) ......................................................................... 20

*Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.,*
  450 U.S. 707 (1981) ......................................................................12, 13

* Authorities upon which we chiefly rely are marked with asterisks.

*Univ. of Notre Dame* v. *Sebelius*,
    743 F.3d 547 (7th Cir. 2014), *reh'g en banc denied*,
    No. 13-3853, ECF No. 64 (May 7, 2014) ................................................ 2, 10, 11, 12, 13

*Wheaton College* v. *Burwell*,
    134 S. Ct. 2806 (2014) ........................................................ 3, 4, 6, 7, 11, 20, 21

## Statutes:

42 U.S.C. § 2000bb-1 ......................................................................................... 10

## Regulations:

29 C.F.R. § 2510.3-16(b) ...................................................................................... 9

29 C.F.R. § 2590.715-2713A(a)(4) ....................................................................... 1

29 C.F.R. § 2590.715-2713A(b)(1) ....................................................................... 1

29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B) ...................................................... 8, 9

45 C.F.R. § 2590.715-2713A(b)(2) ....................................................................... 9

29 C.F.R. § 2590.715-2713A(b)(2)(i) .................................................................. 9

29 C.F.R. § 2590.715-2713A(b)(2)(ii) ................................................................. 9

29 C.F.R. § 2590.715-2713A(c) ........................................................................... 8

29 C.F.R. § 2590.715-2713A(c)(1) ....................................................................... 1

29 C.F.R. § 2590.715-2713A(c)(1)(ii) ................................................................. 8

29 C.F.R. § 2590.715-2713A(d) ......................................................................... 10

45 C.F.R. § 147.131(c)(1)(ii) ................................................................................ 8

45 C.F.R. § 147.131(c)(2)(ii) ................................................................................ 9

45 C.F.R. § 147.131(d) ................................................................ 10

78 Fed. Reg. 39,870 (July 2, 2013) ...................................1, 6, 14, 16, 17, 19, 20

*Coverage of Certain Preventive Services Under the Affordable Care Act,*
    79 Fed. Reg. 51,092 (Aug. 27, 2014) ......................................... 3, 7, 8, 9, 21

**Legislative Materials:**

155 Cong. Rec. 29,070 (2009) ................................................... 17, 18

**Other Authorities:**

Ctrs. for Medicare & Medicaid Servs., *National Health Care Spending*
    *By Gender and Age: 2004 Highlights, available at* http://www.cms.gov
    /Research-Statistics-Data-and-Systems/Statistics-Trends-and-
    Reports/NationalHealthExpendData/downloads/
    2004GenderandAgeHighlights.pdf ............................................ 17

EEOC Compliance Manual § 12-IV.C. (July 22, 2008) ................................. 12

Institute of Medicine, *Clinical Preventive Services for Women:*
    *Closing the Gaps* (2011) ...................................... 16, 17, 18, 20

# GLOSSARY

ERISA        Employee Retirement Income Security Act

HHS          U.S. Department of Health and Human Services

RFRA         Religious Freedom Restoration Act

TPA          Third party administrator

# INTRODUCTION

The Affordable Care Act established additional minimum standards for group health plans, including coverage of certain preventive health services for women without cost sharing.  The regulations implementing this provision generally require group health plans to include coverage of contraceptive services as prescribed by a health care provider without cost sharing.

The regulations contain accommodations, however, for plans established by non-profit organizations that hold themselves out as religious organizations and that have a religious objection to contraceptive coverage.  Under the regulations issued in July 2013, an eligible organization can opt out of the contraceptive coverage requirement by providing its insurance issuer or third party administrator with a copy of a form stating that it is an eligible organization, *see* 78 Fed. Reg. 39,870, 39,874-39,875 (July 2, 2013); *see, e.g.*, 29 C.F.R. § 2590.715-2713A(a)(4), (b)(1), (c)(1).

It is not disputed that the plaintiffs in these consolidated appeals are either eligible for an accommodation, or are religious employers (as defined by reference to a provision of the Internal Revenue Code) that are exempt from the contraceptive coverage provision.

For the reasons set out in our principal brief, plaintiffs have failed to state a claim under the Religious Freedom Restoration Act of 1993 ("RFRA").   When an eligible organization decides not to provide contraceptive coverage, federal law requires third parties—not eligible organizations like the plaintiffs here—to provide

coverage. It is one thing for plaintiffs to decline to provide coverage themselves. It is quite another to insist that they have a right to veto federal regulations that impose duties on other persons. *See Mich. Catholic Conference* v. *Burwell*, 755 F.3d 372, 387 (6th Cir. 2014), *pet. for reh'g pending* (filed July 25, 2014) ("[s]ubmitting the self-certification form to the insurance issuer or third-party administrator does not 'trigger' contraceptive coverage; it is federal law that requires the insurance issuer or the third-party administrator to provide this coverage"); *Univ. of Notre Dame* v. *Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014) ("Federal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services."), *reh'g en banc denied*, No. 13-3853, ECF No. 64 (May 7, 2014).

The Supreme Court's decision in *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) underscores the infirmity of plaintiffs' argument. The Court in that case held that the contraceptive coverage requirement violated RFRA with respect to closely held for-profit corporations that—unlike the plaintiffs here—could not opt out of the requirement. The existence of the opt-out regulations that plaintiffs challenge here was crucial to the Supreme Court's reasoning. The Court explained that the opt-out regulations "effectively exempt[]" organizations that are eligible for an accommodation. *Id.* at 2763. The Court expressly stated that the regulations "seek[] to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all

2

FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759.

The Supreme Court concluded that the opt-out regulations demonstrated that HHS "ha[d] at its disposal an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs." *Id.* at 2782. The Court reasoned that the accommodations allowed under the regulations "serve[] HHS's stated interests equally well" because "female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to 'face minimal logistical and administrative obstacles'" in obtaining the coverage. *Id.* at 2782 (citation omitted). Indeed, "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be *precisely zero*." *Id.* at 2760 (emphasis added); *see id.* at 2759 (explaining that the accommodation "ensur[es] that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage").

On August 22, 2014, the Departments augmented the regulatory accommodation process in light of the Supreme Court's interim order in *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014). *See Coverage of Certain Preventive Services Under the Affordable Care Act*, 79 Fed. Reg. 51,092 (Aug. 27, 2014). The Supreme Court's interim order in *Wheaton College* identified an alternative form of accommodation that

3

would neither affect "the ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives," nor preclude the government from relying on the notice it receives from Wheaton College "to facilitate the provision of full contraceptive coverage under the Act." 134 S. Ct. at 2807. Under the interim final regulations, an organization may opt out by notifying the Department of Health and Human Services of its eligibility and decision rather than by notifying its insurance carrier or third party administrator. This provides eligible organizations like plaintiffs with an alternative mechanism for opting out of the contraceptive coverage requirement.

In sum, plaintiffs' claims fail for the reasons discussed in our principal brief. The decision in *Hobby Lobby* , the interim order in *Wheaton,* and the augmented regulatory accommodations further demonstrate the absence of a viable claim.

## DISCUSSION

### The Supreme Court's Decision in *Hobby Lobby* and Order in *Wheaton College* and the Interim Final Rules Confirm the Validity of the Accommodations.

**A.  1.**  The Supreme Court's decision in *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), confirms the validity of the regulatory accommodations, and its reasoning cannot be reconciled with plaintiffs' position.

The Supreme Court held that application of the contraceptive coverage requirement to the plaintiffs in that case—closely held companies that were not eligible for the regulatory opt out—violated their rights under RFRA. Central to the

Court's reasoning was the existence of the opt-out alternative that the Departments afford to organizations such as the plaintiffs here. The Court explained that the opt-out regulations "effectively exempt[]" organizations that are eligible for an accommodation. *Id.* at 2763. This accommodation, the Supreme Court explained, "seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759. The Court declared that this accommodation is "an alternative" that "achieves" the aim of seamlessly providing coverage of recommended health services to women "while providing greater respect for religious liberty." *Ibid.*

The Supreme Court did not suggest that employers could (or should be entitled to) prevent their employees from obtaining contraceptive coverage from third parties through the regulatory accommodations. To the contrary, the Court reiterated that "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.'" *Id.* at 2781 n.37 (quoting *Cutter* v. *Wilkinson*, 544 U.S. 709, 720 (2005)). The free exercise of religion protected by RFRA cannot "unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling." *Id.* at 2787 (Kennedy, J., concurring).

The Supreme Court thus stressed that "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies

involved in these cases would be precisely zero." *Id.* at 2760; *see id.* at 2782-2783.

After employers opt out, employees "would continue to receive contraceptive

coverage without cost sharing for all FDA-approved contraceptives, and they would

continue to face minimal logistical and administrative obstacles because their

employers' insurers would be responsible for providing information and coverage."

*Id.* at 2782 (citation and internal quotation marks omitted); *see id.* at 2786 (Kennedy, J.,

concurring) (explaining that the accommodation "works by requiring insurance

companies" to provide contraceptive coverage and "equally furthers the

Government's interest").   In responding to the dissent, the Court emphasized that

the accommodations would not "'[i]mped[e] women's receipt of benefits by

"requiring them to take steps to learn about, and to sign up for, a new government

funded and administered health benefit.'"" *Id.* at 2783 (alterations in original, quoting

dissent (in turn quoting 78 Fed. Reg. 39,870, 39,888 (July 2, 2013) with alterations)).

    **2.**  The Supreme Court's interim order in connection with an application for an

injunction in *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014), identified an alternative

method of opting out of the coverage requirement that does not impede the ability of

women to obtain contraceptive coverage to a greater extent than the accommodation

established by the July 2013 regulations.  The Supreme Court's interim order provided

that, "[i]f [Wheaton College] informs the Secretary of Health and Human Services in

writing that it is a nonprofit organization that holds itself out as religious and has

religious objections to providing coverage for contraceptive services, the

[Departments of Health and Human Services, Labor, and the Treasury] are enjoined from enforcing against" Wheaton College provisions of the Affordable Care Act and related regulations requiring coverage without cost-sharing of certain contraceptive services "pending final disposition of appellate review." *Id.* at 2807. The order stated that Wheaton College need not use the self-certification form prescribed by the government or send a copy of the executed form to its health insurance issuers or third party administrators to meet the condition for this injunctive relief. The order also stated that this relief neither affected "the ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives," nor precluded the government from relying on the notice it receives from Wheaton College "to facilitate the provision of full contraceptive coverage under the Act." *Ibid.*

The *Wheaton College* injunction does not reflect a final Supreme Court determination that RFRA requires the government to apply the accommodations in this manner. Nevertheless, the Departments have augmented the existing accommodations to provide an alternative means by which eligible organizations may opt out of providing contraceptive coverage. *See Coverage of Certain Preventive Services Under the Affordable Care Act*, 79 Fed. Reg. 51,092 (Aug. 27, 2014). Under the interim final regulations, an organization may elect to opt out by notifying HHS of its decision directly rather than by notifying its insurance carrier or third party administrator. An organization need not use any particular form and need only

indicate the basis on which it qualifies for an accommodation and its objection to

providing some or all contraceptive services, as well as the type of plan and contact

information for the plan's third party administrators and health insurance issuers. 29

C.F.R. § 2590.715-2713A(b)(1)(ii)(B), (c)(1)(ii); 45 C.F.R. § 147.131(c)(1)(ii).

As is the case with the initial accommodations, if an eligible organization

declines to provide contraceptive coverage, the regulations require the insurance

issuer or third party administrator to make or arrange separate payments for

contraceptive services for the plan participants and beneficiaries. *See, e.g.,* 29 C.F.R.

§ 2590.715-2713A(c). If an organization opts out by notifying HHS, the Departments

will make the necessary communications to ensure that health insurance issuers or

third party administrators make or arrange separate payments for contraception. In

the case of an "insured" group health plan, HHS "will send a separate notification to

each of the plan's health insurance issuers informing the issuer" that HHS "has

received a notice" that the group health plan is opting out of providing contraceptive

coverage on religious grounds, "and describing the obligations of the issuer" under

the regulations. 45 C.F.R. § 147.131(c)(1)(ii). An issuer that receives such a notice

from HHS will "remain responsible for compliance with the statutory and regulatory

requirement to provide coverage for contraceptive services to participants and

beneficiaries," but the objecting organization "will not have to contract, arrange, pay,

or refer for such coverage." 79 Fed. Reg. at 51,095. In the case of a "self-insured"

group health plan, the Department of Labor will "send a separate notification to each

8

third party administrator of the ERISA plan." *Ibid.* The notice will state that HHS

has received a notice that the group health plan is opting out of the contraceptive

coverage requirement and will "describe[] the obligations of the third party

administrator under" the applicable regulations. 29 C.F.R. § 2590.715-

2713A(b)(1)(ii)(B). These include the obligation to make or arrange separate

payments for contraceptive services. *Id.* § 2590.715-2713A(b)(2). The Department of

Labor's communication to the third party administrator(s) will also "designate the

relevant third party administrator(s) as plan administrator under section 3(16) of

ERISA for those contraceptive benefits that the third party administrator would

otherwise manage." 79 Fed. Reg. at 51,095; *see also* 29 C.F.R. § 2510.3-16(b).

     As is also the case with the initial accommodations, the regulations bar the

insurance issuer or third party administrator from charging the eligible organization,

directly or indirectly, with respect to payments for contraceptive services. *See* 45

C.F.R. § 147.131(c)(2)(ii) (insured plans) ("With respect to payments for contraceptive

services, the issuer may not impose any cost-sharing requirements (such as a

copayment, coinsurance, or a deductible), or impose any premium, fee, or other

charge, or any portion thereof, directly or indirectly, on the eligible organization, the

group health plan, or plan participants or beneficiaries."); 29 C.F.R. § 2590.715-

2713A(b)(2)(i), (ii) (same for self-insured plans). And the insurance issuer or third

party administrator—not the eligible organization—must notify plan participants and

beneficiaries of the availability of separate payments for contraceptive services, do so

9

"separate from" materials that are distributed in connection with the eligible organization's group health coverage, and "[t]he notice must specify that the [organization] does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services[.]"  45 C.F.R. § 147.131(d) (insured plans); *accord* 29 C.F.R. § 2590.715-2713A(d) (same for self-insured plans).[1]

    **B.**  RFRA's compelling interest test applies only where government action "substantially burden[s]" a person's exercise of religion, 42 U.S.C. § 2000bb-1, which is a question of law, not a "question[] of fact, proven by the credibility of the claimant."  *Mich. Catholic Conference* v. *Burwell*, 755 F.3d 372, 385 (6th Cir. 2014) (quoting *Mahoney* v. *Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011)), *pet. for reh'g pending* (filed July 25, 2014); *accord Univ. of Notre Dame* v. *Sebelius*, 743 F.3d 547, 558 (7th Cir. 2014), *reh'g en banc denied*, No. 13-3853, ECF No. 64 (May 7, 2014).

    As discussed in our principal brief, plaintiffs have not met their burden of establishing that their opt out constitutes a "substantial burden" under RFRA. Plaintiffs do not object to informing their insurance issuers and third party administrators, or the government, that they believe they are legally permitted not to provide contraceptive coverage and choose not to do so.  Indeed, plaintiffs have generally informed such third parties in the past, and plaintiffs would presumably

---

[1] As noted in our letter of August 26, the interim final rules also delete from the regulations the so-called "noninterference provision."  Accordingly, plaintiffs challenge to that language is now moot.

need to do so even if they were automatically exempt or if they obtained the injunctions that they seek here. Plaintiffs may not assert a "substantial burden" under RFRA by collapsing their decision to opt out of providing contraceptive coverage with the fact that after they do so, the government will generally require (or, for church plans, will offer to pay) third parties to make or arrange separate payments for contraception.

The Supreme Court's observation that parties who may opt out are "effectively exempt[]," *Hobby Lobby* 134 S. Ct. at 2763, underscores this point. The crux of plaintiffs' theory is that opting out of the contraceptive coverage requirement is a "permission slip" (Pl. Br. 10) and "trigger[s]" (Pl. Br. 12) the provision of contraceptive coverage by others, because only if employers or universities opt out does the government require (or offer to pay) third parties to make or arrange *separate* payments for contraception. But as the Supreme Court has also suggested, the government may "rely[] on" a notice from objecting parties to "facilitate the provision of full contraceptive coverage under the Act." *Wheaton Coll.*, 134 S. Ct at 2807. And in that scenario, plaintiffs' "health insurance issuer[s] and third-party administrator[s]" would be "required by *federal law* to provide full contraceptive coverage." *Ibid.* (emphasis added); *see also Mich. Catholic Conference*, 755 F.3d at 387 ("Submitting the self-certification form to the insurance issuer or third-party administrator does not 'trigger' contraceptive coverage; it is federal law that requires the insurance issuer or the third-party administrator to provide this coverage."); *Notre Dame*, 743 F.3d at 554

("[f]ederal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services").

The Seventh Circuit observed in *Notre Dame* that the "novelty" of similar RFRA claims "deserves emphasis." 743 F.3d at 557. The court explained that "United States law and public policy have a history of accommodating religious beliefs, as by allowing conscientious objection to the military draft—and now exempting churches and religious institutions from the Affordable Care Act's requirements of coverage of contraceptive services." *Ibid.* The court stressed that "[w]hat makes this case and others like it involving the contraception exemption paradoxical and virtually unprecedented is that the beneficiaries of the religious exemption are claiming that the exemption process itself imposes a substantial burden on their religious faiths." *Ibid.* Plaintiffs' view that their opt out can constitute a "substantial burden" under RFRA is at odds with our Nation's long history of allowing religious objectors to opt out and others then filling their shoes. *See, e.g., Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 710-711, 716-718 (1981); *cf.* EEOC Compliance Manual § 12-IV.C. (Example 43) (July 22, 2008) (explaining that reasonable accommodations of workplace religious objections can include requiring the objecting employee to transfer objectionable tasks to co-workers). On plaintiffs' reasoning, a conscientious objector could object not only to his own military service, but also to opting out, on the theory that his opt out would "'trigger' the drafting of a

12

replacement who was not a conscientious objector." *Notre Dame*, 743 F.3d at 556.[2]

Similarly, the claimant in *Thomas*, could have demanded not only that he not make

weapons but also that he not be required to *opt out* of doing so, because his opt out

would cause someone else to take his place on the assembly line.

Plaintiffs are "effectively exempt[]," *Hobby Lobby*, 134 S. Ct. at 2763, and their

attempt to collapse the provision of contraceptive coverage by third parties with their

own decision not to provide such coverage fails.  If the employees or students of

organizations that have opted out of providing contraceptive coverage, nonetheless

receive contraceptive coverage, they will do so "*despite* plaintiffs' religious objections,

not *because* of them," *Mich. Catholic Conference*, 755 F.3d at 389 (emphases added;

citation omitted; internal quotations marks omitted).

**C.**  In *Gilardi* v. *U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208 (D.C. Cir.

2013), *vacated* 134 S. Ct. 2902 (2014),  a divided panel of this Court held that the

requirement that employer-sponsored plans cover recommended preventive services

without cost sharing is not the least restrictive means of furthering compelling

governmental interests. *Id.* at 1222-1223.  The Supreme Court's decision in *Hobby*

---

[2] Plaintiffs quarrel with this analogy (Reply Br. 9 n.1), but under plaintiffs' reasoning, a conscientious objector could point to the act of opting out and declare that he must take "action contrary to his sincere religious beliefs" (*id.* at 2), and that the opt out is "an alternative that also requires claimants to act contrary to their beliefs" (*id.* at 6); *see also id.* at 6-7 (urging that a religious accommodation is "a true 'opt out'" only if "[p]laintiffs do not really object to taking the actions required by the 'accommodation'").

*Lobby* and interim order in *Wheaton College*, however, make clear that the accommodations at issue here are the least restrictive means of serving a number of interrelated compelling interests.

  **1.** In *Hobby Lobby*, five members of the Court endorsed the position that providing contraceptive coverage to employees "serves the Government's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." 134 S. Ct. at 2785-2786 (Kennedy, J., concurring); *accord id.* at 2799-2800 & n.23 (Ginsburg, J., dissenting). The remaining Justices assumed without deciding that the contraceptive coverage requirement furthers compelling interests, *id.* at 2780, and emphasized that, under the accommodations for eligible non-profit organizations, employees "would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to face minimal logistical and administrative obstacles because their employers' insurers would be responsible for providing information and coverage," *id.* at 2782 (citation and internal quotation marks omitted); *see id.* at 2760 (stressing that "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero"); *id.* at 2783 (emphasizing that the accommodations would not "'[i]mped[e] women's receipt of benefits by "requiring them to take steps to learn about, and to sign up for, a new government funded and administered health benefit."'") (alterations in original, quoting dissent (in

14

turn quoting 78 Fed. Reg. at 39,888 with alterations)); *id.* at 2786 (Kennedy, J.,
concurring) (explaining that the accommodation "works by requiring insurance
companies" to provide contraceptive coverage and "equally furthers the
Government's interest").

The government's ability to accommodate religious concerns in this and other
areas depends on its ability to fill the gaps created by the accommodations. Plaintiffs,
by contrast, assert that it is insufficient to permit an objector to opt out of an
objectionable requirement; in their view, the government's filling each gap must itself
be subject to compelling-interest analysis and thus the government often may not
shift plaintiffs' obligations to a third party but must instead fundamentally restructure
its operations.

*Hobby Lobby* confirms that, when religious objectors opt out of their legal
obligations, the government may fill those gaps and do so as seamlessly as possible.
*See* 134 S. Ct. at 2782-2783. In our diverse Nation, many requirements may be the
object of religious objections. But government programs, and particularly national
systems of health and welfare, need not vary from point to point or, for example, be
based around what, if any, method of provision of medical coverage can be agreed
upon by all parties, including those who object. The challenged accommodations
provide an administrable way for organizations to state that they object and opt out,
and for the government to require third parties to provide contraceptive coverage.
The Supreme Court admonished in its pre-*Smith* decisions that "[t]he Free Exercise

Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen* v. *Roy*, 476 U.S. 693, 699 (1986).

The government's requirement (or, for church plans, the government's financial incentives) that insurance issuers and third party administrators provide contraceptive coverage after employers and universities decline to do so in particular furthers compelling interests by directly and substantially reducing the incidence of unintended pregnancies, improving birth spacing, protecting women with certain health conditions for whom pregnancy is contraindicated, and otherwise preventing adverse health conditions. *See* 78 Fed. Reg. at 39,872; Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 103-107 (2011) ("IOM Report"); *see also Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("There are many medical conditions for which pregnancy is contraindicated," and "[i]t is important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees.").

Physician and public health organizations, such as the American Medical Association, the American Academy of Pediatrics, and the March of Dimes accordingly "recommend the use of family planning services as part of preventive care for women."  IOM Report 104.  This is not a "broadly formulated interest[] justifying the general applicability of government mandates," *Gonzales* v. *O Centro Espirita*

16

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006), but rather a concrete and specific one, supported by a wealth of empirical evidence.

Use of contraceptives reduces the incidence of unintended pregnancies. IOM Report 102-104. Unintended pregnancies pose special health risks because a woman with an unintended pregnancy "may not immediately be aware that [she is] pregnant, and thus delay prenatal care" and engage in behaviors that "pose pregnancy-related risks." 78 Fed. Reg. at 39,872; *see* IOM Report 103. As a result, "[s]tudies show a greater risk of preterm birth and low birth weight among unintended pregnancies." *Ibid.* And, because contraceptives reduce the number of unintended pregnancies, they "reduce the number of women seeking abortions." 78 Fed. Reg. at 39,872.

The contraceptive coverage regulations, including the religious accommodations, also advance the government's related compelling interest in assuring that women have equal access to recommended health care services. 78 Fed. Reg. at 39,872, 39,887. Congress enacted the women's preventive-services coverage provision because "women have different health needs than men, and these needs often generate additional costs." 155 Cong. Rec. 29,070 (2009) (statement of Sen. Feinstein); *see* IOM Report 18. Prior to the Affordable Care Act, "[w]omen of childbearing age spen[t] 68 percent more in out-of-pocket health care costs than men." 155 Cong. Rec. at 29,070 (statement of Sen. Feinstein); *see* Ctrs. for Medicare & Medicaid Servs., *National Health Care Spending By Gender and Age: 2004 Highlights*, *available at* http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-

17

Trends-and-Reports/NationalHealthExpendData/downloads/2004Genderand

AgeHighlights.pdf.  These disproportionately high costs had a tangible impact:

Women often found that copayments and other cost sharing for important preventive

services "[were] so high that they avoid[ed] getting [the services] in the first place."

155 Cong. Rec. at 29,302 (statement of Sen. Mikulski).  Studies have demonstrated

that "even moderate copayments for preventive services" can "deter patients from

receiving those services."  IOM Report 19.

    **2.**  In a July 8 letter to this Court, plaintiffs suggested that any opt out is in their

view a substantial burden if the government requires the same third parties who

provide plaintiffs' health coverage also to make or arrange separate payments for

contraception.  In plaintiffs' view, the government can achieve its goals only through

such means as "(1) offer[ing] tax deductions or credits for the purchase of

contraceptive services; (2) expand[ing] eligibility for already existing federal programs

that provide free contraception; (3) allow[ing] citizens who pay to use contraceptives

to submit receipts to the government for reimbursement; or (4) provid[ing] incentives

for pharmaceutical companies that manufacture contraceptives to provide such

products . . . free of charge."  Reply Br. 22 (quoting *Conestoga Wood Specialties Corp.* v.

*U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 414 (3d Cir. 2013) (Jordan, J.,

dissenting)).

    These proposals are not less restrictive means of achieving the same

governmental ends.  As the Supreme Court emphasized in *Hobby Lobby*, the

accommodations ensure than women "would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, *and* they would continue to face minimal logistical and administrative obstacles because their employers' insurers would be responsible for providing information and coverage," 134 S. Ct. at 2782 (emphasis added; citation and internal quotation marks omitted). The Supreme Court repeatedly explained that the regulatory accommodations "ensur[e] that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759; *see id.* at 2760 (stressing that "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero"); *id.* at 2783 (emphasizing that the accommodations would not "'[i]mped[e] women's receipt of benefits by "requiring them to take steps to learn about, and to sign up for, a new government funded and administered health benefit."'") (alterations in original, quoting dissent (in turn quoting 78 Fed. Reg. at 39,888 with alterations)); *id.* at 2786 (Kennedy, J., concurring) (explaining that the accommodation "works by requiring insurance companies" to provide contraceptive coverage and "equally furthers the Government's interest").

Whereas "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero," *id.* at 2760, plaintiffs' schemes would not "equally further[] the

Government's interest," *id.* at 2786 (Kennedy, J., concurring), by ensuring that women can seamlessly obtain contraceptive coverage without additional burden—the very point of requiring that health coverage include coverage of contraceptives without cost sharing.  *See* 78 Fed. Reg. at 39,888; IOM Report 18-19.  *See generally Reno* v. *Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (question under free speech strict scrutiny is whether "less restrictive alternatives would be *at least as effective* in achieving the legitimate purpose that the statute was enacted to serve") (emphasis added).

The initial accommodations offer plaintiffs a way to opt out by notifying insurance issuers and third party administrators that they do not wish to provide contraceptive coverage, while requiring or encouraging third parties to make or arrange separate payments for contraception where employers have opted out.  The augmented regulatory accommodation process offers plaintiffs an alternative but still administrable way to state that they object and opt out—without contacting their insurers or third party administrators—while providing the government with the information needed to implement the requirement that third parties provide contraceptive coverage so that participants and beneficiaries can "obtain, without cost, the full range of FDA approved contraceptives," *Wheaton Coll.*, 134 S. Ct. at

2807.[3]  Under both methods of opting out, the effect on participants and beneficiaries is "precisely zero," *Hobby Lobby*, 134 S. Ct. at 2760.

In any event, RFRA does not require the government to create entirely new programs to accommodate religious objections.  *See, e.g., Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("[T]he Court does not address whether the proper response to a legitimate claim for freedom in the health care arena is for the Government to create an additional program.  The Court properly does not resolve whether one freedom should be protected by creating incentives for additional government constraints.  In these cases, it is the Court's understanding that an accommodation may be made to the employers without imposition of a whole new program or burden on the Government.").  An employer with a religious objection to paying the minimum wage to female employees, for example, cannot simply demand that the government make up the difference with tax credits or direct provision of financial aid.

## CONCLUSION

The judgment of the district court in *Priests for Life* should be affirmed.  The judgment of the district court in *Roman Catholic Archbishop of Washington* should be

---

[3] Under the augmented accommodation whereby plaintiffs may notify HHS, "[t]he content required for the notice represents the minimum information necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the policies in the July 2013 final regulations."  79 Fed. Reg. at 51,095.

affirmed insofar as the court ruled in the government's favor, reversed insofar as the court ruled in favor of certain plaintiffs on their RFRA claims, and vacated as moot insofar as it invalidated the so-called "non-interference provision" that was deleted from the regulations.

Respectfully submitted,

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

MARK. B. STERN
ALISA B. KLEIN
*/s/ Adam C. Jed*
ADAM C. JED
PATRICK G. NEMEROFF
MEGAN BARBERO
  *(202) 514-5089*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7531*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

SEPTEMBER 2014

22

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with this Court's September 2 order because it has been prepared in 14-point Garamond, a proportionally spaced font, and contains 5,180 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/ *Adam C. Jed*
Adam C. Jed

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2014, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Adam C. Jed*
Adam C. Jed
